

# ARKANSAS COURT OF APPEALS

DIVISIONS II & III
**No.** CV-15-681

PROGRESSIVE ELDERCARE SERVICES-
SALINE, INC., d/b/a HEARTLAND
REHABILITATION AND CARE CENTER
                                    APPELLANT

V.

TERRY CAUFFIEL, AS ADMINISTRATOR
OF THE ESTATE OF CAROLYN SUE
CAUFFIEL, AND ON BEHALF OF THE
WRONGFUL-DEATH BENEFICIARIES
OF CAROLYN SUE CAUFFIEL
                                    APPELLEE

**Opinion Delivered** November 2, 2016

APPEAL FROM THE SALINE COUNTY
CIRCUIT COURT
[NO. 63-CV-13-355-2]

HONORABLE GARY ARNOLD,
JUDGE

AFFIRMED

## LARRY D. VAUGHT, Judge

Progressive Eldercare Services-Saline, Inc., d/b/a Heartland Rehabilitation and Care Center (Progressive), appeals from the denial of its motion for summary judgment based on the affirmative defense of charitable immunity. We affirm.

Carolyn Sue Cauffiel was a resident of Progressive from February 29, 2012, to July 22, 2012, and passed away on July 25, 2012. On June 14, 2013, Terry Cauffiel, Carolyn's son, as administrator of her estate and on behalf of her wrongful-death beneficiaries, filed a complaint in the Saline County Circuit Court against Progressive and a number of other defendants. The complaint alleged that the defendants had "failed to discharge their obligation of care to Carolyn Sue Cauffiel with a conscious disregard for her rights and safety," which culminated in Carolyn suffering multiple injuries and ultimately death. The complaint alleged numerous causes of actions, including negligence and medical malpractice.

Progressive answered the complaint and subsequently moved for summary judgment seeking charitable immunity. Cauffiel responded and argued that not only was Progressive not entitled to charitable immunity, it was abusing the charitable form to avoid liability. After a hearing, the circuit court denied Progressive's motion for summary judgment, explaining that "I do think there are material issues of fact. The foremost one is the argument that [Progressive] is simply a shell that's abusing its appearance of being a charitable immunity [sic] when in fact it should not be entitled to that." Progressive has appealed the circuit court's denial of summary judgment.

As a general rule, the denial of a motion for summary judgment is neither reviewable nor appealable. *Ark. Elder Outreach of Little Rock, Inc. v. Thompson*, 2012 Ark. App. 681, at 4, 425 S.W.3d 779, 783. The general rule does not apply, however, where the refusal to grant a summary-judgment motion has the effect of determining that the appellant is not entitled to its defense of immunity from suit, because the right of immunity from suit is effectively lost if a case is permitted to go to trial. *Id.*, 425 S.W.3d at 783. This case is, therefore, appealable.

Our standard of review for summary judgment is well settled:

> Summary judgment is to be granted by a trial court only when it is clear that there are no genuine issues of material fact to be litigated and the moving party is entitled to judgment as a matter of law. Once a moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. After reviewing undisputed facts, summary judgment should be denied if, under the evidence, reasonable minds might reach different conclusions from those undisputed facts. On appeal, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of its motion leave a material question of fact unanswered. This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. Our review is not limited to the pleadings, as we also focus on the affidavits and other documents filed by the parties.

*Jackson v. Sparks Reg'l Med. Ctr.*, 375 Ark. 533, 539, 294 S.W.3d 1, 4–5 (2009) (citations omitted).

The object of summary-judgment proceedings is not to try the issues but to determine whether there are any issues to be tried, and if there is any doubt whatsoever, the motion should be denied. *Flentje v. First Nat'l Bank of Wynne*, 340 Ark. 563, 569–70, 11 S.W.3d 531, 536 (2000).

The essence of the charitable-immunity doctrine is that entities created and maintained exclusively for charity may not have their assets diminished by execution in favor of one injured by acts of persons charged with duties under the entity. *George v. Jefferson Hosp. Ass'n*, 337 Ark. 206, 211, 987 S.W.2d 710, 712 (1999). Because the doctrine favors charities and results in a limitation of potentially responsible persons whom an injured party may sue, we give the doctrine a very narrow construction. *Thompson*, 2012 Ark. App. 681, at 6, 425 S.W.3d at 783–84. The burden of pleading and proving this affirmative defense is on the party asserting it. *Id.*, 425 S.W.3d at 784. The issue of whether a party is immune from suit is purely a question of law and is reviewed de novo. *Id.* at 5, 425 S.W.3d at 783.

When determining whether a corporation is entitled to charitable immunity, Arkansas courts consider eight factors:

> (1) whether the organization's charter limits it to charitable or eleemosynary purposes; (2) whether the organization's charter contains a "not-for-profit" limitation; (3) whether the organization's goal is to break even; (4) whether the organization earned a profit; (5) whether any profit or surplus must be used for charitable or eleemosynary purposes; (6) whether the organization depends on contributions and donations for its existence; (7) whether the organization provides its services free of charge to those unable to pay; and (8) whether the directors and officers receive compensation.

*Masterson v. Stambuck*, 321 Ark. 391, 401, 902 S.W.2d 803, 809 (1995). Whether the charitable-entity form has been abused is a "pivotal issue" in determining a defendant's entitlement to

charitable immunity. *Watkins v. Ark. Elder Outreach of Little Rock, Inc.*, 2012 Ark. App. 301, at 12, 420 S.W.3d 477, 484.[1] These factors are illustrative, not exhaustive, and no one factor is dispositive. *Masterson*, 321 Ark. at 401, 902 S.W.2d at 810. Questions of fact may arise when determining whether the charitable form has been abused, i.e., issues surrounding the reasonableness of the organization's expenses and the intent of the party purporting to be a charitable organization, precluding summary judgment on the issue of immunity. *Id.* at 12, 420 S.W.3d at 485.

Progressive first asserts that "undisputed facts" established its entitlement to charitable immunity as a matter of law under the *Masterson* factors. On the first three factors, Progressive argues that it presented sufficient evidence to establish those factors and that Cauffiel did not dispute that evidence. On the fourth factor, whether the organization earned a profit, Progressive argues that although it did have a small profit, it reinvested that profit into its charitable endeavors. Progressive contends that Cauffiel did not contest the facts related to this factor but instead insisted on a "different legal conclusion" based on those facts.

On the fifth factor, which concerns whether any profit or surplus must be used for charitable or eleemosynary purposes, Progressive notes that its articles of incorporation limit the use of net earnings to furthering its charitable purposes and that Cauffiel "did not, and could not, point to the distribution of any profits—as opposed to payment for necessary services rendered at market rates—from Progressive to any private person."

---

[1]In discussing whether an organization abused its charitable form, our holding in *Watkins* did not create a ninth *Masterson* factor as suggested in Judge Harrison's concurrence. The abuse-of-the-corporate-form analysis was derived directly from the third, fourth, and fifth *Masterson* factors, *Watkins*, 2012 Ark. App. 301, at 10–11, 420 S.W.3d at 484–85, where the analysis is focused on the organization's profits. *Masterson*, 321 Ark. at 401, 902 S.W.2d at 809.

The sixth factor is whether the organization depends on contributions and donations for its existence, and Progressive concedes that it does not rely on charitable contributions and donations to operate. However, Progressive cites caselaw noting that a modern hospital would find it "extremely difficult to operate wholly or predominately on charitable donations" and that relying on other funding sources does not "negate its overriding charitable purpose." *George*, 337 Ark. at 214, 987 S.W.2d at 714.

On the seventh factor, whether the organization provides its services free of charge to those unable to pay, Progressive contends that it proved it had provided at least $290,000 in free health-care services during its first two years of operation and that it accepts residents regardless of their ability to pay. Progressive argues that Cauffiel failed to meet proof with proof on this factor and instead relied on a legal conclusion from John Langham, a certified public accountant, who opined that "given the millions of dollars in revenue generated by [Progressive], I found no evidence of significant services being offered free of charge or to those unable to pay."

Regarding the eighth factor, whether the directors and officers receive compensation, Progressive explains that its board members receive no compensation but that its executive director, who is also a board member, receives a yearly salary of $88,040.16. Progressive asserts that this is far below the level of executive compensation allowed in similar cases and is consistent with its attempt to procure the most qualified individuals to run its facility.

In addition to the above factors, Progressive also addresses the abuse-of-the-charitable-form issue and contends that Cauffiel failed to present sufficient evidence of such abuse. Progressive argues that it "established no abuse of the charitable form because it has liability

insurance and any payments made to arguably 'related entities' were market rates for necessary services." In so arguing, Progressive distinguishes itself from other cases in which a nonprofit was formed to avoid having to purchase liability insurance (*e.g.*, *Watkins* and its progeny[2]). Progressive also argues that the rates it paid for services to any related entities were commensurate with those paid by other nonprofit and for-profit long-term-care facilities for those same services; thus, no abuse of the charitable form occurred.

In response, Cauffiel does not contest the facts underlying the *Masterson* factors per se but does argue that Progressive has structured its business in such a way to abuse the charitable form. Cauffiel asserts that Progressive's profit is "cleverly concealed by paying various related entities for rent, management, janitorial services, staffing services, and information technology services." According to Cauffiel, the case at bar mirrors the case of *Watkins*. In that case, the circuit court granted summary judgment to Arkansas Elder Outreach (AEO) on the basis of charitable immunity, but this court reversed:

> Appellant contends that AEO's goal was not to break even but to make a healthy profit, which was not used for charitable purposes, and offered evidence of AEO's net income and retained earnings during the relevant time period. It is true that the existence of profits and retained surplus are not necessarily determinative of charitable status; however, what is significant is AEO's payments to HC Staffing, HC Financial, and especially the owners of the leased facilities, which AEO characterizes as nothing but the reasonable expenses of doing business. Appellant asserts that the earnings are actually being siphoned off, in the guise of expenses, to make it appear as if AEO has much less of a profit than it actually does, and that a question of fact remains to be tried as to whether AEO was created, not as a genuine charitable entity, but as one designed to keep substantial profits flowing to the investors without purchasing

---

[2]*Watkins's* progeny includes *Ark. Elder Outreach of Little Rock v. Thompson*, 2012 Ark. App. 681, 425 S.W.3d 779; *Carnell v. Ark. Elder Outreach of Little Rock, Inc.*, 2012 Ark. App. 698, 425 S.W.3d 787; and *Ark. Elder Outreach of Little Rock, Inc. v. Nicholson*, 2013 Ark. App. 758.

SLIP OPINION

liability insurance. . . . AEO responds that it entered into leases with the owners of the facilities in arms-length transactions, with monthly lease payments commensurate with market rates, and that appellant offered no evidence that those payments or its other expenses were unreasonable, exorbitant, or above market rate.

In resolving this issue, however, it is important to keep in mind that AEO, not appellant, bore the burden of establishing its right to summary judgment; that the charitable-immunity doctrine is to be narrowly construed; and that the pivotal issue in this case is whether the charitable-entity form has been abused. AEO convinced the trial court that, as a matter of law, its monthly expenses were reasonable and that the corporate entities and expenses were not intentionally structured as a way to funnel profits to the investors without buying liability insurance. Thus, in deciding this issue on appeal from a summary judgment, we must determine if there is a question of fact as to whether these expenses were reasonable; however, it has long been held that whether something is reasonable is a question of fact. Additionally, whether the charitable form has been abused is a question of fact, and summary judgment is improper when there are genuine issues of material fact as to a party's intent.

We hold that genuine issues of material fact remain to be tried as to whether AEO is, in fact, a nonprofit, charitable organization. . . . We offer no opinion as to whether AEO is a genuine charitable organization or merely a device for maximizing profits for the investors by evading the need to purchase liability insurance; that question is for the trier of fact to determine. Accordingly, we reverse and remand the summary judgment as to AEO.

*Watkins*, 2012 Ark. App. 301, at 10–13, 420 S.W.3d at 484–85 (internal citations omitted).

Cauffiel argues that the present case is akin to *Watkins* because, while Progressive's articles of incorporation include the necessary statutory language for a nonprofit and charitable entity, it does not depend on contributions or donations for its existence, the majority of its revenue comes from Medicare and Medicaid, its bad-debt expense is insignificant when compared to the amount of revenue generated, and it passes its profits to other related entities in order to maintain charitable status. Cauffiel explains that four of the five independent contractors on Progressive's payroll—which receive a combined total of over $4.5 million annually—are related entities, and three of these independent contractors, which are also

7

codefendants in the present case, were all incorporated by, and have the same registered agent

of service as, Progressive. Cauffiel also notes that John Ponthie, Ross Ponthie, and Mark

Thompson, additional codefendants in this case and owners of Progressive, are also owners

of several of these independent contractors. Finally, Cauffiel explains that Progressive appears

to use a related "captive insurer" for its professional-liability insurance, which is consistent

with a for-profit entity. As explained by John Langham, Cauffiel's accounting expert:

> [Progressive] paid $499,800 for professional liability insurance despite the fact that they only had insurance coverage in the amount of $150,000 per occurrence and $600,000 aggregate. The cost of the insurance coverage seems extremely high for the amount of coverage provided which is consistent with the utilization of a "Captive Insurer." Based on my experience, utilization of a related "Captive Insurer" generally involves the operating company, [Progressive], paying and deducting excessively high insurance premiums to the related "Captive Insurance" company. . . . The related "Captive Insurance" company enjoys the tax benefit of being able to exclude [its] first $1 million dollars [sic] in premium income from ordinary income tax. The owners of the "Captive Insurance" company then recover those excess premiums at a later date as a capital gain income upon the liquidation of the "Captive Insurance" company. Said income is then taxed only as a capital gains of ordinary income representing a significant tax savings.

While Progressive maintains that payments to these related entities are reasonable costs of

doing business, Cauffiel argues that, as explained in *Watkins*, the trier of fact must determine

whether those expenses are reasonable; thus, summary judgment is not appropriate.

In reply, Progressive continues to insist that "there are no issues of disputed fact, just

different legal interpretations by the parties," so summary judgment is appropriate. Progressive

also contends that this case is unlike *Watkins* because, unlike the defendant in that case,

Progressive has proved that its costs and expenses were at market rate and therefore

reasonable. Progressive argues that

8

if the costs and expenses [Progressive] expends for services are reasonable, it does not matter whether the entities are related or unrelated, or whether they have any common ownership interests, because [Progressive] would pay the same amounts—or more—to any other entity for the same services that are required to operate a nursing home.

Progressive also points out inconsistencies in the law on charitable immunity and suggests that the Arkansas Supreme Court should clarify the law.

We hold that *Watkins* and its progeny are on point and require us to affirm the circuit court's denial of Progressive's motion for summary judgment. As did the plaintiff in *Watkins*, Cauffiel has presented a question of fact on the issue of whether Progressive abused the charitable form. As set forth above, Cauffiel presented evidence that Progressive, which appears on paper to not have a profit, is actually making a significant profit but is funneling its profits to other companies that it owns or that are related entities. Similar to the argument made by the nursing home in *Watkins*, Progressive contends that its payments to its related entities are reasonable. However, in *Watkins* we held that the reasonableness of payments to related entities was a question of fact precluding summary judgment. *Watkins*, 2012 Ark. App. 301, at 12, 420 S.W.3d at 485. Cauffiel also presented evidence that Progressive was using a related captive insurer, which Cauffiel's expert testified was a structure consistent with a for-profit company; not a nonprofit. This evidence also raises a question of fact on the issue of Progressive's intent, which we held in *Watkins* precluded summary judgment. *Id.* 420 S.W.3d at 485. Because this is a case in which genuine issues of material fact remain to be tried as to whether Progressive abused the charitable form and whether it is, in fact, a nonprofit, charitable organization, we affirm the circuit court's order denying Progressive's summary-judgment motion.

SLIP OPINION

Progressive argues that the circuit court was required to determine as a matter of law whether it was entitled to charitable immunity and that *Watkins* and its progeny have erroneously converted what is a question of law into a question of fact in all cases where a plaintiff alleges abuse of the charitable form. We disagree. As set forth above, the case at bar (along with *Watkins* and its progeny), which was presented to the circuit court on a summary-judgment motion, cannot be decided as a matter of law because there are genuine issues of material fact on the issue of the legitimacy of the charitable form. It is a question for the trier of fact to determine.

This does not mean that in every case where a plaintiff challenges a nursing home's charitable form a question of fact is raised, effectively eliminating charitable immunity. A review of the facts in each case is required to determine whether the party opposing summary judgment presents sufficient evidence to create a genuine issue of material fact. In cases where a genuine issue of material fact does not exist, the circuit court can rule on the charitable-immunity issue as a matter of law. However, if the evidence presented creates a genuine issue of material fact, the matter cannot be determined as a matter of law, and summary judgment is inappropriate. Because the case at bar is one in which genuine issues of material fact remain to be tried as to whether Progressive abused the charitable form, we must affirm the circuit court's denial of summary judgment.

Affirmed.

GRUBER, HIXSON, and BROWN, JJ., agree.

HARRISON and GLOVER, JJ., concur.

**BRANDON J. HARRISON, Judge, concurring.** The circuit court denied summary judgment given *Watkins v. Arkansas Elder Outreach of Little Rock, Inc.*—the case in which this court injected the "abuse of the corporate form" factor into the charitable-immunity doctrine. By affirming the circuit court's decision today this court applied stare decisis. I therefore join the decision to affirm the denial of Progressive's motion for summary judgment to the extent the majority holds solely that a legally important fact question exists on whether there has been a so-called abuse of the corporate form for the purpose of deciding whether charitable immunity should be conferred right now. Progressive established the supreme court's eight *Masterson v. Stambuck* factors beyond a meaningful dispute, so today's decision in this case, and the two companion cases, only require that a jury answer the corporate-form question: "Because the case at bar is one in which genuine issues of material fact remain to be tried as to whether Progressive abused the corporate form, we must affirm the court's denial of summary judgment." *Maj. Op. at 10.*

When this court altered the common-law doctrine of charitable immunity in 2012, a number of questions and concerns arose. I briefly address some that come to mind.

The beginning is a good place to start. The corporate-abuse factor that this court used in *Watkins* was transplanted from a case that did not involve charitable-immunity law. In *K.C. Properties of Northwest Arkansas, Inc. v. Lowell Inv. Partners, LLC*, 373 Ark. 14, 32, 280 S.W.3d 1, 15 (2008), our supreme court was asked to decide, in a phrase, whether "the corporate veil of the limited-liability companies should be pierced." Here is the supreme court's statement in *K.C. Properties* that was used four years ago to forge a new (ninth) factor to be considered when deciding whether to grant charitable immunity:

It is a nearly universal rule that a corporation and its stockholders are separate and distinct entities, even though a stockholder may own the majority of the stock. In special circumstances, the court will disregard the corporate facade when the corporate form has been illegally abused to the injury of a third party. The conditions under which the corporate entity may be disregarded or looked upon as the alter ego of the principal stockholder vary according to the circumstances of each case. The doctrine of piercing the corporate veil is founded in equity and is applied when the facts warrant its application to prevent an injustice. Piercing the fiction of a corporate entity should be applied with great caution. The issue of whether the corporate entity has been fraudulently abused is a question for the trier of fact, and the one seeking to pierce the corporate veil and disregard the corporate entity has the burden of proving that the corporate form was abused to his injury.

*Id.* at 32, 280 S.W.3d at 15-16 (internal citations omitted).

Charitable immunity appears nowhere in the supreme court's discussion above or elsewhere in that case because it had nothing to do with the usual context in which the piercing-the-corporate-veil doctrine has been used in Arkansas. The equitable doctrine this court borrowed from *K.C. Properties*, one that has historically been applied "with great caution," expressly requires an allegation that "the corporate form has been illegally abused to the injury of a third party." *Id.*, 280 S.W.3d at 15-16. The alleged illegal abuse in the cases decided today is that Progressive and other entities have been structured and operated in some entangled manner so that Progressive looks less profitable on paper than it really is so it may claim charitable immunity and be shielded from these lawsuits. The identifiable "injury," I presume, is that the appellees' lawsuits will abruptly end if immunity is conferred, though that is the potential consequence every time the issue is raised by a party. As I read the parties' arguments, the appellees have really made a public-policy argument that Arkansas's charitable-immunity law should not shield the particular business organization/operational structure of

which Progressive is a part. However one characterizes the appellees' argument, it found a champion in *Watkins*'s ninth element.

I am concerned that the ninth factor will soon, as a practical matter, swallow whole the other eight. Given today's decisions, all eight *Masterson* factors can be decided for the entity seeking immunity, but as long as *Watkins*'s ninth one is disputed then immunity will not be given as a matter of summary-judgment law. Why is the ninth factor so "pivotal," to use this court's word in *Watkins*? Has *Watkins* (and subsequent cases from this court) essentially neutralized the other eight in the supreme court's decades-old case law?

Now that three cases will be sent back to circuit court, we should turn to what happens next because some important procedural issues will likely arise. One is whether a circuit court should separate the returning immunity issue from the trial process that will address the merit of the appellees' numerous substantive claims. No decision today discusses the appellees' factual allegations in much detail (the three operative complaints together total nearly 100 pages) because the substantive allegations are legally unimportant for charitable-immunity analyses. We have not mandated bifurcation today, but common sense counsels that insulating immunity proceedings from those that address the merit of the appellees' substantive claims can help ensure that the immunity question is not influenced by the underlying allegations. This is not a novel notion. If the mention of a party being insured, or the premature reference to the wealth of a defendant, can potentially prejudice personal-injury cases, *see, e.g.*, *Synergy Gas Corp. v. Lindsey*, 311 Ark. 265, 843 S.W.2d 825 (1992), and *Poff v. Elkins*, 2014 Ark. App. 663, 449 S.W.3d 315, then litigating these cases' merits before totally wrapping up the immunity issue could, at a minimum, unnecessarily entangle two separate legal processes.

Whether or not a circuit court decides to separate the returning charitable-immunity question from a case's merit, no one can avoid asking which party on remand has the burden to prove (presumably by a preponderance of the evidence) the abuse-of-the-corporate-form factor. We have yet to provide an answer, though one is important because it affects decisions the parties and circuit courts may face—like how to instruct the jury. I believe the appellees should have to prove that Progressive abused the corporate form after these cases are returned to the circuit courts. This position naturally follows from the piercing-the-corporate-veil doctrine that *Watkins* took from *K.C. Properties*, which requires that the party asserting some type of corporate abuse has occurred must prove that he was "abused to his injury," whatever the phrase may mean.

Finally, a point on the process of litigating charitable immunity and who decides disputed facts. Depending on which rule of civil procedure is used, either a circuit judge or a jury might decide factual disputes related to the immunity question. Here, because Rule 56 was used in all three cases, juries will be tasked to decide whether Progressive abused the corporate form in the charitable-immunity context. A second appeal would then be immediately available from each circuit judge's decision to grant or deny immunity given the jury's answer, presuming a party wanted to pursue another appeal.

On the other hand, if parties proceed under Arkansas Rule of Civil Procedure 52 then a circuit judge would receive evidence relevant to deciding whether an entity was a charitable one under the *Masterson/Watkins* line of cases and confer immunity or not. A party wanting to immediately appeal an adverse decision could promptly do so. An appellate court would then apply the appropriate standard of review (one that includes how the law was applied to

the facts and whether sufficient evidence supported the court's factual findings) and affirm the court's decision or reverse it. This process is arguably the more straightforward, consistent, and simplest one that parties and courts can prepare for and execute when dealing with charitable immunity. And from a judicial economy/party resources vantage point, one appeal, not two, is much more likely. The ship has sailed in these cases; but future litigants and circuit judges should consider whether a bench-trial process more faithfully embodies the often repeated tenet that charitable immunity is an issue of law that courts decide.

**DAVID M. GLOVER, Judge, concurring.** Though I agree with the majority's decision, I write separately to express a belief that the idea of charitable immunity for nursing homes, in the present day of Medicare and Medicaid funding, is archaic and one whose time has passed. There are no present-day nursing homes operating exclusively for a charitable purpose. Further, it is a legal fiction that any nursing home today is entitled to charitable immunity simply because its legal form is structured to enable profits to be siphoned off to subsidiary for-profit companies—owned by the same people who own the "charitable" nursing home. Government payments for services are still payments for services, and writing off "what Medicare or Medicaid does not pay" does not equate to providing free services. The long-range solution to this problem is for either our supreme court or our legislature to abolish the theory of charitable immunity for nursing homes altogether. Until then, it will be necessary to arrive at the conclusion the majority held today—it is a question of fact as to whether a nursing home is entitled to charitable immunity. Therefore, I concur.

*Kutak Rock LLP*, by: *Mark W. Dossett* and *Jeff Fletcher*, for appellant.
*Reddick Moss, PLLC*, by: *Brian D. Reddick*, *Robert W. Francis*, and *Matthew D. Swindle*, for appellee.