2012 Ark. App. 681

ARKANSAS ELDER OUTREACH OF LITTLE ROCK, INC., Appellant

v.

Linda Faye THOMPSON, Appellee.

No. CA 11–1310.

Court of Appeals of Arkansas.

Dec. 5, 2012.

Rehearing Denied Jan. 9, 2013.

Wilkes & McHugh, P.A., Little Rock, by: Melody H. Piazza and Deborah Truby Riordan, for appellee.

LARRY D. VAUGHT, Chief Judge.

This case involves the defense of charitable immunity raised by the operator of a nursing home. Arkansas Elder Outreach of Little Rock, Inc., d/b/a Willowbend in Manon, Arkansas (AEO), appeals from the circuit court's denial of its motions for summary judgment on the basis of charitable immunity against appellee Linda Faye Thompson, personal representative of the estate of Mary Ray, deceased, and Healthcare Staffing Associates, Inc. We affirm the denial of both motions.

AEO is the license holder and operator of several nursing homes in Arkansas, including Willowbend, in which appellee's decedent was a resident when she allegedly suffered personal injuries. Appellee filed this action alleging negligence, medical malpractice, felony neglect, and violations of the Arkansas Residents' Rights Act in March 2009. She named AEO; HC Staffing; Healthcare Financial Advisors, LLC; Marion Healthcare Arkansas, LLC;[1] Charlotte Baskins; David Threlkeld; and Steven Eckler as defendants.[2]

AEO raised the affirmative defense of charitable immunity and moved for summary judgment on that ground, filing copies of its articles of incorporation, the letter from the Internal Revenue Service granting it tax-exempt status, its bylaws, the affidavit of Doug Walsh (a director of AEO, and an employee of HC Financial before becoming AEO's executive director), and excerpts from Walsh's deposition. In his affidavit, Walsh stated,

---

Dover Dixon Horne PLLC, Little Rock, by: Thomas S. Stone, for appellant.

1. Marion Healthcare is AEO's landlord for Willowbend. The circuit court granted appellee's motion for voluntary nonsuit of her claims against it.

2. The individuals were sued for negligence in their capacities as administrators of Willowbend.

I am a Director and authorized agent of Arkansas Elder Outreach of Little Rock, Inc[.], a not-for-profit corporation organized under the laws of the State of Arkansas. Elder Outreach operates the Malvern Nursing Home. Elder Outreach is managed by a Board of Directors comprised of the Administrators and Directors of Nurses for Malvern Nursing Home and other nursing homes. Elder Outreach is a 501(c)(3) charitable corporation.

Elder Outreach accepts patients that cannot pay, for whom they then attempt to obtain Medicaid payments. Elder Outreach retains care of such residents even if Medicaid benefits are not obtained. Elder Outreach does not earn a profit and any surplus is used to operate and improve nursing and facility services and to offset the cost of those residents who are unable to pay or fully pay. Elder Outreach's monetary goal is to break even while providing its nursing care services.

AEO filed a supplemental affidavit of Walsh in which he discussed the creation and administrative structures of AEO. HC Financial, and HC Staffing, and their relationships with each other. Attached as exhibits to his affidavit were the agreement between HC Financial and AEO, AEO's agreement with HC Staffing, and a list of contributions by AEO to charities.

In response, appellee argued that AEO was created by a for-profit entity (Southern Key Investments) that took advantage of Arkansas's charitable-immunity doctrine in a fraudulent scheme to continue operating under the guise of a nonprofit entity, that the for-profit entity had sought to insulate itself from liability for its nursing-home operations by forming separate for-profit entities to provide necessary services to AEO; that there was a question of fact as to whether AEO manipulated its lease payments and fees to HC Financial and HC Staffing to make it look as though it did not make a profit, that AEO failed to make a prima facie showing that it was a genuine charitable organization, and that this issue should be decided by the jury.

Appellee argued in the alternative that charitable immunity, if applicable at all, would apply only to AEO's respondeat-superior liability for the acts of its agents and employees, and not to its own "institutional negligence." She also argued that the Residents' rights statute had abolished the charitable-immunity doctrine as to claims brought under it, and that the doctrine of charitable immunity should be abolished in Arkansas. She attached excerpts from Walsh's depositions, minutes of some of AEO's board meetings, its tax returns for 2007 and 2009; its application for exemption with the IRS; and its schedule of debt write-offs and contributions from 2003 to 2008. In its reply, AEO filed a second supplemental affidavit of Walsh; the deposition of Chris McMorris, and its discovery responses, including the lease entered into between Marion Healthcare[3] and AEO for the Willowbend facility. HC Staffing filed a cross-claim against AEO for contribution. AEO moved for summary judgment against HC Staffing on the basis of charitable immunity, filing copies of their agreement and its contributions from 2003 through 2010.

The circuit court granted the motions for summary judgment filed by HC Financial, Baskins, Threlkeld, and Eckler, and denied HC Staffing's motion for summary judgment. It denied AEO's motions for summary judgment against appellee and HC Staffing without explanation, from which AEO appealed.

---

**3.** Southern Key is the managing partner of Marion Healthcare.

As a general rule, the denial of a motion for summary judgment is neither reviewable nor appealable. *Helena–W. Helena Sch. Dist. v. Monday*, 361 Ark. 82, 204 S.W.3d 514 (2005). The general rule does not apply, however, where the refusal to grant a summary-judgment motion has the effect of determining that the appellant is not entitled to its defense of immunity from suit, as the right of immunity from suit is effectively lost if a case is permitted to go to trial. *Gentry v. Robinson*, 2009 Ark. 634, 361 S.W.3d 788; *City of Fayetteville v. Romine*, 373 Ark. 318, 284 S.W.3d 10 (2008); *Robinson v. Beaumont*, 291 Ark. 477, 725 S.W.2d 839 (1987); *Martin v. Hallum*, 2010 Ark. App. 193, 374 S.W.3d 152; *see also* Ark. R.App. P.-Civ. 2(a)(2) (2012), which provides that an appeal may be taken from an order that in effect determines the action and prevents a judgment from which the appeal might be taken. This case is, therefore, appealable.

The issue of whether a party is immune from suit is purely a question of law, and is reviewed de novo. *Gentry, supra*. Summary judgment may be granted by a trial court only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, clearly show that there are no genuine issues of material fact to be litigated and that the party is entitled to judgment as a matter of law. *Watkins v. Arkansas Elder Outreach of Little Rock, Inc.*, 2012 Ark. App. 301, 420 S.W.3d 477. When the movant makes a prima facie showing of entitlement, the respondent must meet proof with proof by showing a genuine issue as to a material fact. *Id.* On appeal, we need only decide if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion left a material question of fact unanswered. *Id.* In making this decision, we view the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Summary judgment is improper when there are genuine issues of material fact as to a party's intent, and should be denied if reasonable minds might reach different conclusions from the undisputed facts. *Id.*

Appellant challenges appellee's arguments to the circuit court that the Residents Rights statute abrogated the charitable-immunity doctrine on claims brought against nursing homes under that act and that the doctrine could not shield AEO from liability for its institutional negligence, even if it did apply to AEO's vicarious liability for the acts of its agents and employees.[4] We need not, however, decide these issues, because, as addressed below, AEO did not prove its entitlement to charitable immunity as a matter of law. *See Downing v. Lawrence Hall Nursing Ctr.*, 2010 Ark. 175, at 12 n. 5, 369 S.W.3d 8, 15 n. 5.

As in *Watkins*, we base our decision on AEO's failure to establish its status as a genuine charitable organization as a matter of law. The essence of the charitable-immunity doctrine is that agencies, trusts, etc., created and maintained exclusively for charity, may not have their assets diminished by execution in favor of one injured by acts of persons charged with duties under the agency or trust. *George v. Jefferson Hosp. Ass'n*, 337 Ark. 206, 987 S.W.2d 710 (1999). Because the

4. Appellee also argued below that, even if AEO otherwise established its entitlement to the charitable-immunity defense, the time has come to abolish the doctrine in Arkansas. We explained in *Watkins*, however, that the supreme court has refused to abolish the doctrine, and we must follow its precedent.

doctrine favors charities and results in a limitation of potentially responsible persons whom an injured party may sue, we give the doctrine a very narrow construction, and the burden of pleading and proving this affirmative defense is on the party asserting it. *Id.*

An entity's status as a nonprofit organization is but one of eight factors to be considered in determining whether it is entitled to charitable immunity. To determine whether an organization is entitled to charitable immunity, courts consider the following factors.

> (1) whether the organization's charter limits it to charitable or eleemosynary purposes, (2) whether the organization's charter contains a not-for-profit limitation, (3) whether the organization's goal is to break even, (4) whether the organization earned a profit, (5) whether any profit or surplus must be used for charitable or eleemosynary |7purposes, (6) whether the organization depends on contributions and donations for its existence, (7) whether the organization provides its services free of charge to those unable to pay, and (8) whether the directors and officers receive compensation.

*Watkins,* 2012 Ark. App. 301, at 9, 420 S.W.3d at 483. These factors are illustrative, not exhaustive, and no single factor is dispositive of charitable status. *Id.,* 420 S.W.3d at 483.

The supreme court has described the appellate court's inquiry into charitable-immunity status as follows. While there may be fact issues involved, they are not matters of disputed fact. Rather, they are differing legal interpretations of undisputed facts. In such cases, an appellate court should grant summary judgment where reasonable persons would not reach different conclusions based upon those undisputed facts. *George,* 337 Ark. at 212–

13, 987 S.W.2d at 713. Sometimes, however, it is appropriate for the jury to determine whether an entity is a genuine charitable organization. *See Crossett Health Ctr. v. Croswell,* 221 Ark. 874, 256 S.W.2d 548 (1953). In *Watkins,* we held that reasonable, fair-minded persons could reach different conclusions based on the undisputed facts, and we reversed the circuit court's award of summary judgment to AEO:

> There is no dispute that AEO's articles of incorporation included the necessary statutory language for a nonprofit and charitable entity and, as admitted by Walsh, it does not depend on contributions or donations for its existence, most of its revenue comes from Medicare and Medicaid programs, with the balance from third-party payors and private patients. Although appellant argues that AEO's purported "free care" is simply "bad debt" and that very little, if any, care is given free of charge to indigents, this factor is not particularly important in light of the fact that Medicare and Medicaid play such significant roles in funding nursing-home care. *See Jackson v. Sparks Reg'l Med. Ctr.,* 375 Ark. 533, 294 S.W.3d 1 (2009). Additionally, the directors of AEO receive only $500 for attending each board meeting. *See id.*

|8In this case, the third, fourth, and fifth factors are clearly the most relevant. Appellant contends that AEO's goal was not to break even but to make a healthy profit, which was not used for charitable purposes, and offered evidence of AEO's net income and retained earnings during the relevant time period. It is true that the existence of profits and retained surplus are not necessarily determinative of charitable status, *see Anglin [v. Johnson Reg'l Med. Ctr.,* 375 Ark. 10, 289 S.W.3d 28 (2008) ],

*supra; George, supra;* however, what *is* significant is AEO's payments to HC Staffing, HC financial, and especially the owners of the leased facilities, which AEO characterizes as nothing but the reasonable expenses of doing business. Appellant asserts that the earnings are actually being siphoned off, in the guise of expenses, to make it appear as if AEO has much less of a profit than it actually does, and that a question of fact remains to be tried as to whether AEO was created, not as a genuine charitable entity, but as one designed to keep substantial profits flowing to the investors without purchasing liability insurance, Her argument includes the principles underlying the "piercing-the-corporate-veil" doctrine, which provides that, in special circumstances, a court will disregard the corporate facade when the corporate form has been illegally abused to the injury of a third party. *K.C. Props. of Nw. Ark., Inc. v. Lowell Inv. Partners, LLC,* 373 Ark. 14, 280 S.W.3d 1 (2008).[5] The issue of whether the corporate entity has been abused is a question for the trier of fact. *Id.* AEO responds that it entered into leases with the owners of the facilities in arms-length transactions, with monthly lease payments commensurate with market rates, and that appellant offered no evidence that those payments or its other expenses were unreasonable, exorbitant, or above market rate.

In resolving this issue, however, it is important to keep in mind that AEO, not appellant, bore the burden of establishing its right to summary judgment, that the charitable-immunity doctrine is to be narrowly construed, and that the pivotal issue in this case is whether the charita-

ble-entity form has been abused. AEO convinced the trial court that, as a matter of law, its monthly expenses were reasonable and that the corporate entities and expenses were not intentionally structured as a way to funnel profits to the investors without buying liability insurance. Thus, in deciding this issue on appeal from a summary judgment, we must determine if there is a question of fact as to whether these expenses were reasonable, however, it has long been held that whether something is reasonable is a question of fact. *See Ford Motor Credit Co. v. Ellison,* 334 Ark. 357, 974 S.W.2d 464 (1998); *Crum v. Craig,* 2010 Ark. App. 531, [379] S.W.3d [71]; *Mountain Pure, L.L.C. v. Affiliated Foods Sw., Inc.,* 96 Ark.App. 346, 241 S.W.3d 774 (2006). Additionally, whether the charitable form has been abused is a question of fact, *see K.C. Props., supra,* and summary judgment is improper when there are genuine issues of material fact as to a party's intent. *Mercy Health Sys. [of Nw. Ark., Inc. v. Bicak,* 2011 Ark. 341, [383] S.W.3d [833] ].

We hold that genuine issues of material fact remain to be tried as to "whether AEO is, in fact, a nonprofit, charitable organization. Technically, its originators took the necessary steps to create one on paper. The proof offered by appellant, however, revealed that the primary impetus for AEO's creation was to enable the nursing homes to continue to operate profitably without purchasing liability insurance, that the creation of AEO did not change the actual operation of the nursing homes, and that, whether the money generated by the nursing

---

**5.** *See also Advocat, Inc. v. Sauer,* 353 Ark. 29, 51–52, 111 S.W.3d 346, 358–59 (2003), *cert. denied,* 540 U.S. 1012, 124 S.Ct. 532, 157 L.Ed.2d 424 (2003), where there was clear testimony by Advocat's former chief financial officer that a parent corporation and two subsidiaries were operated as one business.

homes is labeled "reasonable expenses" or profits, it continued to flow in the same direction as it did before. We also find that the trial court's reliance on *George, supra,* was misplaced. In that case, the hospital demonstrated that its profit margin was between 4% to 5%, far below that of for-profit hospitals which typically seek profit margins in the 15% to 20% range." 337 Ark. at 213, 987 S.W.2d at 713. Also, the hospital's use of its surplus was consistent with, and in furtherance of, its overall charitable purpose—"to provide health care to all who need it." 337 Ark. at 213–14, 987 S.W.2d at 714. Neither fact was established in the case at bar. We offer no opinion as to whether AEO is a genuine charitable organization or merely a device for maximizing profits for the investors by evading the need to purchase liability insurance, that question is for the trier of fact to determine. Accordingly, we reverse and remand the summary judgment as to AEO.

2012 Ark. App. 301, at 10–13, 420 S.W.3d at 484–85.

AEO asserts that it established, as a matter of law, that it was a genuine charitable corporation, that its leases with the owners of the facilities were arms-length transactions, with monthly payments commensurate with market rates, that its contractual relationships with HC Financial and HC Staffing were reasonable expenditures for services rendered, and that appellee failed to establish otherwise. AEO also argues that, although it has obtained a surplus in some years, it has been retained for unexpected expenses, that in the event of dissolution, any existing surplus will be donated to charity, that its profit margin was slightly less than 6% in 2007 and about 2% in 2009; that its failure to rely on charitable donations and its payment of $500 fees to board members for their attendance at board meetings will not defeat

charitable-immunity status, that it accepts residents that cannot pay, for whom it attempts to obtain Medicaid or Medicare payments, and that, even if such payments cannot be secured, it retains care of those residents.

The evidence produced by the parties revealed that Southern Key Investments was the general partner of limited partnerships that owned and operated several nursing homes in Arkansas. David McCollister was Southern Key's general partner. Doug Walsh and Chris McMorris worked at Southern Key, in which Walsh also owned an interest, he still owns a 10% interest in Southern Key. Chad Blackwell is a CPA who, although not an employee of Southern Key, prepared its tax: returns and financial papers. In 2002, it became extremely expensive to obtain liability insurance for nursing homes in Arkansas, and McCollister considered selling the nursing homes. As Walsh explained in his depositions, he was instrumental in developing a plan for the nursing homes to remain in business without having to purchase liability insurance. AEO was formed as a nonprofit entity in 2002 to lease the facilities that Southern Key had owned and to operate the nursing homes. Southern Key is still the general partner of the limited partnerships that continue to own the physical facilities leased by AEO. Willowbend was added to the group of nursing homes operated by AEO in 2005.

According to Arkansas's Department of Human Services, AEO, HC Staffing, and HC Financial are related parties. Blackwell and McMorris formed HC Financial in 2003 to provide financial services for the nursing homes. Blackwell became a one-third owner of HC Financial, with McMorris and Elaine McManus (another employee of Southern Key). Walsh and other employees at Southern Key went to

work at HC Financial because Southern Key no longer provided such services. According to Blackwell, he became employed by HC Financial in 2005 and terminated his interest in it in December 2007. Essentially, the services that Blackwell, Walsh, and McMorris provided to the facilities through HC Financial were the same services that they had provided as employees or contractors of Southern Key. Walsh became employed by AEO in 2010 and is now its executive director, he performs essentially the same services for AEO that he performed while working for HC Financial. McMorris, Blackwell, and McManus formed HC Staffing in 2003 to provide the direct caregivers at the nursing homes. Although the agreement between HC Staffing and AEO provided that HC Staffing was to supervise the employees, AEO actually did so, HC Staffing prepared the related paperwork. HC Financial, HC Staffing, and Southern Key continue to share the same address in Baton Rouge, Louisiana.

Additionally, AEO admits that Southern Key is the managing member of AEO's landlord at Willowbend; although it insists that its negotiations for lease payments to the owners of the facilities were arms-length transactions, there was more than enough evidence in one of Walsh's depositions to raise a question of fact on that issue. Southern Key, therefore, as a partner of the limited partnerships that are the landlords of AEO, receives rental income from the nursing homes. Walsh, who is also a part owner of Southern Key, negotiates the lease agreements on behalf of AEO. The 2008 agreement provided that the monthly lease payments would include a base rate of $40,000, plus 25% of gross revenue over $390,000, as additional rent. As we explained in *Watkins*, what is reasonable is usually a question of fact, and it was AEO's burden to establish its entitlement to charitable-immunity status.

AEO did not establish that the lease payments are reasonable as a matter of law. Walsh's deposition testimony was relied on extensively by both parties. We hold that his description of the reasons for AEO's creation, its relationships with HC Staffing, HC Financial, the limited partnerships, and Southern Key; and his negotiation of the lease payments for the facilities demonstrated the existence of a genuine issue of material fact as to whether AEO is truly a charitable entity. We therefore affirm the circuit court's denial of its motions for summary judgment.

Affirmed.

GLADWIN and MARTIN, JJ., agree.