SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV-14-985

| | |
|---|---|
| GRACIE NEAL, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JOHNNY NEWBORN, AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF JOHNNY NEWBORN<br><br>APPELLANT<br><br>V.<br><br><br>DAVIS NURSING ASSOCIATION d/b/a DAVIS LIFE CARE CENTER<br>APPELLEE | **Opinion Delivered** September 16, 2015<br><br>APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT [NO. CV 2013-217-5]<br><br>HONORABLE JODI RAINES DENNIS, JUDGE<br><br>REVERSED AND REMANDED |

## RITA W. GRUBER, Judge

This appeal follows an order granting summary judgment to Davis Life Care Center, a long-term-care provider, based upon the doctrine of charitable immunity. The sole issue on appeal is whether the trial court properly concluded that Davis was immune from suit. After a de novo review, we conclude that the trial court erred in determining on summary judgment that the charitable-immunity doctrine precluded Davis from suit. We reverse and remand this case for further proceedings.

Johnny Newborn resided at Davis Life Care Center (Davis) from May 18, 2011, until his death on December 6, 2011. Following his death, Gracie M. Neal, Mr. Newborn's sister and the appellant, was appointed as personal representative of his estate for the purpose of pursuing a personal-injury, wrongful-death action.

SLIP OPINION

On April 25, 2013, Neal sued Davis on behalf of the estate of Johnny Newborn alleging (1) negligence, (2) medical malpractice, (3) breach of the admission agreement, (4) violations of the Long-Term Care Facility Residents' Rights Act, and (5) breach of the provider agreement. The essence of her case was that, while in Davis's care, Johnny Newborn suffered numerous injuries, including multiple infected bedsores, improper catheter care that led to erosion of the penis, multiple urinary tract infections, malnutrition, dehydration, aspiration, and ultimately, death. She sought compensatory and punitive damages, attorneys' fees, and costs.

On November 14, 2013, Davis filed a motion for summary judgment claiming entitlement to charitable immunity. Neal opposed the motion. Ultimately, the trial court granted summary judgment to Davis. In the order for summary judgment, the court concluded that Neal did not provide any evidence that refuted the material facts proving that Davis is a nonprofit organization created for charitable purposes. This timely appeal followed.

The doctrine of charitable immunity is premised on the idea that an entity created and maintained exclusively for charity should not have its assets diminished by judgments in favor of one injured by the charity's agent. *George v. Jefferson Hosp. Ass'n*, 337 Ark. 206, 987 S.W.2d 710 (1999). Because the doctrine results in a limitation of potentially responsible persons whom an injured party may sue, our courts give it a very narrow construction. *Id.* The party seeking to benefit from the affirmative defense of charitable immunity bears the burden of proving its entitlement to it. *Carnell v. Ark. Elder Outreach of Little Rock, Inc.*, 2012 Ark. App. 698, 425 S.W.3d 787.

SLIP OPINION

Our courts have adopted eight factors to review when deciding whether a corporation is entitled to charitable immunity. *Masterson v. Stambuck*, 321 Ark. 391, 401, 902 S.W.2d 803, 809 (1995). These factors include:

> (1) whether the organization's charter limits it to charitable or eleemosynary purposes; (2) whether the organization's charter contains a "not-for-profit" limitation; (3) whether the organization's goal is to break even; (4) whether the organization earned a profit; (5) whether any profit or surplus must be used for charitable or eleemosynary purposes; (6) whether the organization depends on contributions and donations for its existence; (7) whether the organization provides its services free of charge to those unable to pay; and (8) whether the directors and officers receive compensation.

*Id.* These factors are illustrative, not exhaustive, and no one factor is dispositive of charitable status. *Id.* at 401, 902 S.W.3d at 810. In addition to these factors, "whether the charitable entity form has been abused" is a "pivotal issue" in determining a defendant's entitlement to charitable immunity. *Watkins v. Ark. Elder Outreach of Little Rock, Inc.*, 2012 Ark. App. 301, at 12, 420 S.W.3d 477, 484.

When addressing a question of law, we conduct a de novo review of an order granting summary judgment. *Ark. Elder Outreach of Little Rock, Inc. v. Thompson*, 2012 Ark. App. 681, 425 S.W.3d 779. On review, we must determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party left a material question of fact unanswered. *Id.* Our supreme court describes the appellate court's inquiry into charitable-immunity status as follows:

> While there may be fact issues involved, they are not matters of disputed fact. Rather, they are differing legal interpretations of undisputed facts. In such cases, an appellate court should grant summary judgment where reasonable persons would not reach different conclusions based upon those undisputed facts.

*George*, 337 Ark. at 212–13, 987 S.W.2d at 713. We view the evidence in a light most

  Cite as 2015 Ark. App. 478

favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id*. at 210, 987 S.W.2d at 712.

Our analysis begins with a consideration of the *Masterson* factors. It is undisputed that Davis satisfies factors 1, 2, and 8. Davis's charter limits its operation to charitable purposes and contains a not-for-profit limitation. Additionally, its board members and officers serve without compensation. The evidence as it relates to the remaining factors is not clearly in Davis's favor.

*Whether Davis's Goal Was to Break Even*

We next consider whether Davis's goal was to break even. Its articles of incorporation and mission statement do not specifically address this issue, and Davis admits that it does not strictly seek to break even. However, it presented affidavits from Kenny Bonds, a board member since 2001, and Jay Hickey, a CPA who has consulted for Davis for seven years, that indicate that Davis does not earn a profit. Davis uses this evidence to support its contention that it intends to merely break even. Jay Hickey's affidavit provided that Davis's "charitable business approach" resulted in it experiencing annual losses. Nowhere does Davis define how the charitable business approach differs from a typical business approach. Furthermore, a portion of Davis's mission statement provides that it "must operate according to sound economic principles." Whether Davis's goal was to break even is susceptible to different interpretations by reasonable minds and is a question of fact.

*Whether Davis Earned a Profit*

Davis utilized affidavits from Kenny Bonds and Jay Hickey to establish that it does not

earn a profit. They each testified that Davis has operated at a loss since its inception as a nonprofit entity in 2001.[1] One might inquire as to how Davis has had the ability to remain operational after over a decade of financial losses. When discussing a nonprofit hospital in *George*, our supreme court noted that modern hospitals are "complex and expensive, technological, economic and medical enterprises that can ill afford to come short of [breaking] even in their financial integrity." *George*, 337 Ark. at 213, 987 S.W.2d at 713. This language regarding hospitals is equally applicable to nursing homes. While this language was used in *George* to illustrate that "the existence of a profit is not determinative of charitable status," we conclude that the lack of a profit in a longstanding business could cause reasonable minds to question whether an entity is truly operating at a deficit each year or manipulating its financial records to create the perception that it is operating at a deficit.

*Whether Davis Must Use Any Profit or Surplus for Charitable Purposes*

We must also consider whether Davis must use any profit or surplus for charitable purposes. According to Davis's financial records, it has never earned a profit, and therefore, it has never had a surplus to use. Davis's bylaws require that its board members and officers serve without pay, and its articles of incorporation provide that no part of its net earnings will inure to the benefit or be distributable to any of its directors, officers, or other private individuals. Thus, Davis contends that any profits earned would be held and reinvested in its continued operation. Even so, a question remains as to whether reinvesting profits is sufficient to satisfy this factor especially if the evidence, taken as a whole, challenges the true

---

[1] Prior to 2001, Davis operated as a for-profit entity.

5



charitable nature of the facility.

*Whether Davis Provides Its Services Free of Charge to Those Unable to Pay and Whether It Depends On Contributions and Donations for Its Existence*

Another consideration is whether Davis offers services free of charge to those unable to pay. The affidavits of Kenny Bonds and Jay Hickey reflect that it gives some free care in that it forgives bad debts of those who cannot or do not pay for its services and that it charges its private-pay residents the lowest rate allowed, resulting in a reduction of its overall revenue. The evidence before us indicates that Davis admits patients with the presumption that they will pay their bills: all patients admitted to Davis are initially charged for their care, and only when they cannot or do not pay are those debts forgiven. Davis failed to establish that forgiving uncollectable debt is equivalent to providing free services. Moreover, the amount of debt forgiven by those who do not or cannot pay is minuscule in comparison to Davis's overall revenue. The bad debt forgiven by Davis amounted to less than 1% of revenue in 2011, 5.76% in 2012, and 2.2% in 2013.[2] We hold that reasonable minds could view this minute amount of debt forgiveness as creating a facade of charity instead of a true charity.

Additionally, Davis clearly fails to satisfy the *Masterson* factor regarding dependence on charitable donations. The evidence shows that it only received $100 in donations each year in 2012 and 2013. These paltry donations could not have had any meaningful effect on Davis's finances. While Davis clearly fails to satisfy this factor, our supreme court has held that

---

[2] In 2011, Davis's total revenue was $9,389,273, and it forgave $90,000 in bad-debt expenses. In 2012, its total revenue was $9,648,078 and $555,509 in bad-debt expenses was forgiven. In 2013, Davis's total revenue was $8,169,493, and it forgave $179,648 in bad-debt expenses.

it would be extremely difficult for a modern hospital to rely wholly or predominantly on charitable donations for its operation. *George*, *supra*. This logic naturally extends to nursing homes, which are similar entities providing similar services. We recognize that the failure to satisfy this element does not necessarily negate an overall charitable purpose. However, when this is considered in the context of Davis's similarly meager amount of bad debt forgiven, reasonable minds could conclude that Davis was not truly charitable or that Davis was merely manipulating the charitable form to avoid purchasing liability insurance and to shield itself from judgment, and therefore, presents a factual issue.

*Whether Davis Has Abused the Charitable Entity Form*

A final consideration is whether the evidence could cause reasonable minds to disagree about whether Davis has abused the charitable-entity form. *Watkins*, *supra*. The flow of money and the relationship between the facility and other service providers can be critical to determining whether an entity is truly charitable or merely a conduit through which to funnel money and divert profits. Of particular interest to us is a contract between Davis and Morrison Management Specialists. Davis had a contract with Morrison Management Specialists to provide dining, housekeeping, and maintenance services. The agreement between Davis and Morrison provided these services to Davis, Hazel Street Nursing Association, Garden Point Living Center, Whispering Knoll Limited Partnership, and The Gardens Limited Partnership. Davis contends that each of these entities is separately owned. However, Davis's contract with Morrison Management Specialists provides that each of these

entities was collectively doing business as Davis Life Care Services.[3] Reasonable minds could conclude that Davis Life Care Services was operating as a holding company. We know that at least two of these entities are for-profit ventures. This contract, at the very least, raises factual questions regarding whether Davis was abusing the charitable-entity form by utilizing Davis Life Care Services as a means to conceal profits.

After a de novo review wherein we resolved all doubts and inferences against Davis, we conclude that reasonable persons could reach different conclusions based upon the undisputed facts presented. Considered together, Davis's relationship to Davis Life Care Services, its failure to ever earn a profit, its questionable characterization of free care and lack of charitable donations, and its intentions as it relates to profitability could reasonably result in the conclusion that Davis was not truly operating as a charity and, therefore, not entitled to charitable immunity.

Accordingly, we reverse the order of summary judgment and remand this case for further proceedings.

Reversed and remanded.

KINARD and HIXSON, JJ., agree.

*Reddick Moss, PLLC*, by: *Brian D. Reddick*, *Matthew D. Swindle*, and *Robert W. Francis*, for appellant.

*Anderson, Murphy & Hopkins, L.L.P.*, by: *David A. Littleton* and *Mark D. Wankum*, for appellee.

---

[3]Additionally, Davis shares a board of directors with at least one of the other entities under the Davis Life Care Services umbrella.