Cite as 2021 Ark. App. 236

# ARKANSAS COURT OF APPEALS

DIVISIONS III AND IV
No. CV-19-324

| | |
|---|---|
| ST. BERNARDS COMMUNITY HOSPITAL CORPORATION D/B/A CROSSRIDGE COMMUNITY HOSPITAL<br><br>APPELLANT<br><br>V.<br><br>TERRY CHENEY, IN HIS CAPACITY AS SPECIAL ADMINISTRATOR OF THE ESTATE OF SANDRA CHENEY, DECEASED; CHARLES KING BIBBY, M.D.; WYNNE MEDICAL CLINIC, P.A.; JAMES DONALD CATHEY, M.D.; ZACHARY LLOYD STEVENSON, M.D.; AND ELIZABETH A. RAMSEY, R.N.<br><br>APPELLEES | Opinion Delivered: May 12, 2021<br><br>APPEAL FROM THE CROSS COUNTY CIRCUIT COURT [NO. 19CV-17-192]<br><br>HONORABLE E. DION WILSON, JUDGE<br><br>REVERSED AND REMANDED |

## KENNETH S. HIXSON, Judge

This case involves the defense of charitable immunity raised by a hospital. The appellee, the estate of Sandra Cheney, deceased[1] (Cheney), filed a lawsuit alleging negligence and medical negligence against St. Bernards Hospital Corporation d/b/a CrossRidge Community Hospital (CrossRidge), three physicians, and several John Doe defendants. CrossRidge filed a motion for summary judgment arguing it was entitled to charitable immunity. The trial court denied the motion for summary judgment, finding

---

[1]Terry Cheney, in his capacity as special administrator of the estate of Sandra Cheney, deceased.

that there are material issues of disputed facts as to whether the doctrine of charitable immunity applies. CrossRidge appealed. We hold that the trial court erred in finding that there were material facts in dispute, and we reverse and remand for the trial court to decide whether CrossRidge is entitled to charitable immunity on the undisputed facts.

Sandra Cheney was a patient at CrossRidge and died in the care of the hospital after experiencing septic shock and associated system failure. After her death, her husband was appointed as special administrator of her estate and sued CrossRidge and several other doctors and entities for negligence and medical negligence in their care and treatment of Ms. Cheney.[2]

St. Bernards Community Hospital Corporation is incorporated under the Arkansas Non-Profit Act, operating several health-care facilities including doing business as CrossRidge Community Hospital.[3] CrossRidge operates an acute care hospital located in Wynne, Arkansas, and provides emergency and acute hospital care to citizens of Cross County, Arkansas, and surroundings areas. Gary Sparks is the administrator of CrossRidge.

CrossRidge filed a motion for summary judgment claiming it was immune from suit based on the doctrine of charitable immunity. CrossRidge attached supporting exhibits that included its articles of incorporation and bylaws, an independent auditor's report, its

---

[2]The others sued include Wynne Medical Clinic, P.A.; Dr. James Donald Cathey, M.D.; Dr. Zackary Lloyd Stevenson, M.D.; Charles King Bibby, M.D.; Elizabeth A. Ramsay, R.N.; John Does Insurers 1–10; and John Does 1–10.

[3]St. Bernards Healthcare, Inc. (SBHC) is the parent company of all St. Bernards entities, including CrossRidge. SBHC is not a party to this litigation; however, Harry Hutchison is the vice president and chief financial officer of SBHC and submitted an affidavit and a deposition regarding the financial matters of CrossRidge.

financial statements, its financial-assistance policy, and confirmation from the Internal Revenue Service of CrossRidge's tax-exempt status. CrossRidge also attached the affidavit of Harry Hutchison.[4] In his affidavit, Hutchison stated:

2. I am the Vice President and Chief Financial Officer at St. Bernards Healthcare, Inc. ("SBHC"). In this capacity, I manage financial matters affecting SBMC, St. Bernards Hospital, Inc., d/b/a St. Bernards Medical Center ("SBMC"), and St. Bernards Community Hospital Corporation, d/b/a CrossRidge Community Hospital ("CrossRidge"). I am knowledgeable as to the organizational and operational status of all three entities.

3. SBHC, SBMC, and CrossRidge are charitable, non-profit corporations. The Craighead County Circuit Court affirmed SBHC's charitable status on July 28, 2016, and it has affirmed SBMC'S charitable status six times in the past seventeen years.

4. CrossRidge is a critical access hospital located in Wynne, Cross County, Arkansas. SBHC formed CrossRidge in 1999. Since Cross County is considered a Health Professional Shortage Area, CrossRidge envisions itself as the county's "indispensable provider of healthcare."

5. CrossRidge's stated mission is "to provide Christ-like healing to the community through education, treatment, and health services." Accordingly, CrossRidge's Articles of Incorporation set forth that the hospital is a public-benefit corporation operated exclusively for charitable, religious, scientific, and educational purposes.

6. Like SBHC and SBMC, CrossRidge qualifies for tax-exempt status as a charitable organization pursuant to Section 501(c)(3) of the Internal Revenue Code.

7. Approximately seventeen percent (17%) of Cross County's population consists of people over the age of sixty-five (65). In the most recent Community Health Needs Assessment, the median income in the county was $18,919, while the median income in Arkansas was $28,554. Due to these factors, Cross County residents are at a higher risk of developing cardiovascular disease and other diseases whose prevalence increases due to poor diet, unhealthy behaviors, and lack of knowledge. Since health-promotion activities in the county are such a high priority, CrossRidge offers free community health screenings and education sessions.

8. In furtherance of its mission, CrossRidge also voluntarily provides free and discounted services to indigent patients at the same level of care provided to those

---

[4]Hutchison later gave a deposition wherein he expounded on the information in his affidavit.

who are able to pay. From 2015 to 2017, the cost of charity care provided by CrossRidge was $1,819,984 (which represents 292% of CrossRidge's net income over that period). CrossRidge does not pursue collection of accounts that qualify as charity care.

9. CrossRidge sets an annual budget to ensure good business practices and, consequently, to further and sustain its charitable mission. To the extent any monies received from patients or other sources are in excess of CrossRidge's operational costs, CrossRidge returns those monies to the organization's resources to perpetuate its charitable community benefit of providing medical assistance to the public. Specifically, CrossRidge reinvests its surplus to offset inflation, stay abreast of new technology, obtain state-of-the-art equipment, and improve the ability of the hospital to provide healthcare for the citizens of Cross County. Moreover, none of this surplus inures to the benefit of any director, officer, or other person.

10. From 2015 to 2017, CrossRidge returned its total surplus of $623,243 to the organization's resources. CrossRidge's profit margins for those years were, respectively: (.01%); 1.33%; and 1.34%. In 2015 and 2016, CrossRidge dedicated a total of $1,584,425 to purely charitable services, which was more than five-times its net income during that period.

11. Due to its limited Net Patient Service Revenue, CrossRidge depends on contributions for its continued existence. In the past four years (2013-2017), CrossRidge has received $10,032,852 in contributions, primarily through grants. Without these contributions, CrossRidge would have incurred substantial losses.

12. CrossRidge's directors are not compensated for their work, and only SBHC compensates CrossRidge's executives. With the exception of Gary Sparks, who is CrossRidge's Administrator, CrossRidge's executives serve in the same positions for SBHC and SBMC and are compensated accordingly. To ensure compensation is within the market rate, a nationally recognized compensation firm annually reviews executive salaries. SBHC sets Executive Salary Ranges below the fortieth percentile nationally.

Cheney opposed CrossRidge's motion for summary judgment, contending that there were issues of material fact in dispute. A hearing was held on CrossRidge's summary-judgment motion, and the trial court took the motion under advisement. The trial court subsequently entered an order denying the motion for summary judgment. In its order, the trial court found:

4

> The court having considered all the pleadings and evidence on file, received the arguments of counsel and considering the law and the facts applicable thereto, the court finds that there are material *disputed facts* as to whether the doctrine of charitable immunity applies in this case. . . . Therefore, the motion for summary judgment is . . . denied[.]

(Emphasis added.) The trial court did not advise the parties which material facts it found to be in dispute.

CrossRidge timely appealed from the trial court's order denying summary judgment. CrossRidge argues on appeal that it established entitlement to summary judgment on the basis of charitable immunity.

The essence of the charitable-immunity doctrine is that organizations such as agencies and trusts created and maintained exclusively for charity may not have their assets diminished by execution in favor of one injured by acts of persons charged with duties under the agency or trust. *George v. Jefferson Hosp. Ass'n*, 337 Ark. 206, 987 S.W.2d 710 (1999). Charitable immunity is immunity from *suit*, not simply immunity from liability. *See Low v. Ins. Co. of N. Am.*, 364 Ark. 427, 220 S.W.3d 670 (2005). Immunity from suit is an entitlement not to stand trial or face the other burdens of litigation, while immunity from liability is a mere defense to a suit. *See Robinson v. Beaumont*, 291 Ark. 477, 725 S.W.2d 839 (1987). Because the charitable-immunity doctrine favors charities and results in a limitation of potentially responsible persons whom an injured party may sue, we give the term "charitable immunity" a narrow construction. *Williams v. Jefferson Hosp. Ass'n*, 246 Ark. 1231, 442 S.W.2d 243 (1969).

As an initial matter, we must address Cheney's argument that the trial court's order denying CrossRidge's summary-judgment motion is not an appealable order. We disagree.

Cheney cites the general rule that the denial of a motion for summary judgment is neither reviewable nor appealable. *See Martin v. Hallum*, 2010 Ark. App. 193, 374 S.W.3d 152. However, our court has routinely reviewed and decided orders in cases where the trial court has refused to grant summary judgment based on the defense of charitable immunity. *See Progressive Eldercare Services-Saline, Inc. v. Cauffiel*, 2016 Ark. App. 523, 508 S.W.3d 59; *Progressive Eldercare Services-Saline, Inc. v. Garrett*, 2016 Ark. App. 518; *Gain, Inc. v. Martin*, 2016 Ark. App. 157, 485 S.W.3d 729; *Ark. Elder Outreach of Little Rock, Inc. v. Thompson*, 2012 Ark. App. 681, 425 S.W.3d 779.

In *Thompson*, *supra*, we explained that the general rule does not apply when the refusal to grant a summary-judgment motion has the effect of determining that the appellant is not entitled to its defense of immunity from suit because the right of immunity from suit is effectively lost if a case is permitted to go to trial. *Thompson*, 2012 Ark. App. 681, at 4, 425 S.W.3d at 783; *see also* Ark. R. App. P.–Civ. 2(a)(2) (providing that an appeal may be taken from an order that in effect determines the action and prevents a judgment from which the appeal might be taken). We acknowledge that in *White River Health Systems, Inc. v. Long*, 2018 Ark. App. 284, 551, S.W.3d 389, cited by Cheney, we created a narrow exception to this rule when the order denying summary judgment on charitable immunity specifically bifurcates the charitable-immunity issue and the liability issue. However, this exception does not apply here because in the order denying CrossRidge's summary-judgment motion, the trial court did not bifurcate the proceedings. Therefore, the order denying summary judgment is appealable.

6

Having concluded that the order is appealable, we now turn to the relevant factors in deciding the charitable-immunity issue. In *Masterson v. Stambuck*, 321 Ark. 391, 902 S.W.2d 803 (1995), the supreme court delineated several factors to determine whether an organization is entitled to charitable immunity. These factors are:

> (1) whether the organization's charter limits it to charitable or eleemosynary purposes; (2) whether the organization's charter contains a "not-for-profit" limitation; (3) whether the organization's goal is to break even; (4) whether the organization earned a profit; (5) whether any profit or surplus must be used for charitable or eleemosynary purposes; (6) whether the organization depends on contributions and donations for its existence; (7) whether the organization provides its services free of charge to those unable to pay; and (8) whether the directors and officers receive compensation.

*Id*. at 401, 902 S.W.2d at 809. These factors are illustrative, not exhaustive, and no single factor is dispositive of charitable status. *Id*. at 401, 902 S.W.2d at 810. This court has also held that a pivotal issue in determining one's entitlement to charitable immunity is whether the charitable form has been abused. *See Watkins v. Elder Outreach of Little Rock,* 2012 Ark. App. 301, 420 S.W.3d at 477. After *Watkins* and its progeny, this court has consistently engaged in an analysis of whether there has been abuse of the charitable-immunity form when deciding charitable-immunity cases. *See, e.g.*, *Progressive Eldercare Services-Saline, Inc. v. Cauffiel*, 2016 Ark. App. 523, 508 S.W.3d 59.

The standard for whether to grant summary judgment in a charitable-immunity case was set forth by our supreme court in *Anglin v. Johnson Regional Medical Center*, 375 Ark. 10, 15, 289 S.W.3d 28, 31 (2008): "The law is well settled that summary judgment is to be granted by a circuit court when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law." The current state of

7

the law in such cases, however, was elucidated in the supreme court's recent decision in *Davis Nursing Home Ass'n v. Neal*, 2019 Ark. 91, 570 S.W.3d 457.[5]

In *Neal III*, the supreme court held that although disputed fact issues concerning an organization's charitable status may be presented to a jury, the ultimate question of charitable immunity is a matter for the court to decide. Here is the operative language in *Neal III*:

> In some cases, while there may be fact issues involved, they are not matters of disputed fact. Rather they are differing legal interpretations of undisputed facts. In such cases, the circuit court should grant summary judgment where reasonable persons would not reach different conclusions based upon those undisputed facts.
>
> . . . .
>
> If the existence of charitable immunity turns on disputed factual issues, then the jury may determine the facts, and the circuit court will subsequently determine whether those facts are sufficient to establish charitable immunity.

*Neal III*, 2019 Ark. 91, at 6–8, 570 S.W.3d at 461–62 (citations omitted).

The threshold question in the *Neal III* framework is whether there are disputed material facts or whether there are undisputed facts with differing interpretations. If there are disputed material facts regarding charitable immunity, then summary judgment is improper because these disputed facts must be determined by a jury. If, however, there are undisputed facts and merely differing interpretations of those facts, then summary judgment is proper if reasonable persons could not reach different conclusions based on those undisputed facts.

---

[5]For the sake of clarity, we acknowledge there are three appellate decisions regarding the dispute between Davis Nursing Home Association and Neal. These are *Davis Nursing Home Ass'n v. Neal*, 2015 Ark. App. 478, 470 S.W.3d 281; *Davis Nursing Home Ass'n v. Neal*, 2018 Ark. App. 413, 560 S.W.3d 485; and *Davis Nursing Home Ass'n v. Neal*, 2019 Ark. 91, 570 S.W.3d 457. We will refer to *Davis Nursing Home Ass'n v. Neal*, 2019 Ark. 91, 570 S.W.3d 457, as "*Neal III*."

In this case, the trial court denied CrossRidge's motion for summary judgment after finding that there were disputed material facts on the issue of charitable immunity. However, for the reasons expressed *infra*, we conclude that the trial court erred in finding that there were disputed material facts. Rather, our review of the record reveals that the facts in this case were undisputed with merely different interpretations.[6] Therefore, in the summary-judgment proceeding, the trial court should have determined whether CrossRidge was entitled to charitable immunity on these undisputed facts.

A review of the *Masterson* factors as they relate to the evidence presented is necessary in determining whether CrossRidge is entitled to summary judgement on the charitable-immunity issue. The first two factors are (1) whether the organization's charter limits it to charitable or eleemosynary purposes; and, (2) whether the organization's charter contains a "not-for-profit" limitation. Here, CrossRidge's articles of incorporation provide that CrossRidge is a corporation organized "exclusively for charitable, religious, scientific, and educational purposes." CrossRidge is tax exempt and its bylaws state that CrossRidge has powers "granted by the Ark. Non-Profit Corp. Act of 1993." They also state that CrossRidge shall not engage in activities inconsistent with federal nonprofit tax status. These facts were not disputed.

Factor (3) is whether the organization's goal is to break even; and factor (4) is whether the organization earned a profit. Harry Hutchison did not testify that CrossRidge's goal was strictly to break even. However, Hutchison did testify that the hospital struggles to

---

[6]We note that the only testimony presented came from SBHC's CFO, Harry Hutchison.

9

break even and does not have a significant surplus. In his affidavit, Hutchison stated that the hospital had profit margins of (0.1%), 1.33%, and 1.34% for the years 2015–2017. Hutchison indicated that SBHC keeps the hospital solvent and pays the vendors for CrossRidge. He stated that when there are funds available, CrossRidge will transfer those funds back to SBHC dollar for dollar to offset the amount SBHC paid for CrossRidge's bills. He stated that, without the funding from SBHC, CrossRidge could not operate. In his affidavit, Hutchison stated that CrossRidge's total combined surplus for 2015–2017 was $623,243, which was all returned to SBHC.

In meeting proof with proof, Cheney offered no evidence to attack Hutchison's testimony. Instead, Cheney only offered an argument that CrossRidge does show a surplus, and that it discounts its numbers by payments to entities with joint ownership, which it admits are separate and distinct. In response to this argument, CrossRidge cites *George v. Jefferson Regional Medical Center*, 337 Ark. 206, 987 S.W.2d 710 (1999), in support of its contention that the existence of a profit is not determinative of charitable status. In *George*, the supreme court stated that trying to break even is only one factor and certainly not a dispositive one when applied to a hospital. The court reasoned that "running a small surplus should not be seen as totally incompatible with charitable status" because "[m]odern hospitals are complex and expensive, technological, economic and medical enterprises that can ill afford to come short of even in their financial integrity." 337 Ark. at 213, 987 S.W.2d at 713.

Our review of the evidence as applied to the third and fourth factors reveals no material facts in dispute. Rather, the facts are undisputed and may be subject to different

10

interpretations. That being so, these were issues to be decided by the trial court—instead of being submitted to a jury—under the *Neal III* framework.

The fifth factor is whether CrossRidge must use any profits or surplus for charitable purposes. CrossRidge's articles and bylaws state that no part of its net earnings will inure to the benefit or be distributable to any of its directors, officers, or other private persons. Hutchison stated that any profits are returned to the organization's resources to perpetuate its charitable-community benefit of providing medical assistance to the public. Hutchison stated that CrossRidge reinvests its surplus to offset inflation, stay abreast of new technology, obtain state-of-the art equipment, and improve the hospital's ability to provide healthcare for the citizens of Cross County. Cheney does not contest these facts but argues that Hutchison's statements strongly favor the denial of CrossRidge's motion for summary judgment. In *Progressive Eldercare Services-Saline, Inc. v. Krauss*, 2014 Ark. App. 265, we stated that the nursing home's use of profits for building improvements and operating expenses was a factor for the court to weigh and to determine if this use furthered charitable purposes. Similar to factors three and four, we conclude that there are no disputed facts that relate to factor five but instead that the parties have differing interpretations of the undisputed facts.

The sixth factor requires an inquiry into whether CrossRidge depends on contributions and donations for its existence. Hutchison testified that over the past four years CrossRidge received more than $10,000,000 in contributions, which were primarily through government grants. He conceded that CrossRidge received only a small amount of private donations, which he said amounted to only $96,198 in 2016. Hutchison also

11

stated that SBHC has had to fund CrossRidge's operations in order for the hospital to survive.

However, our supreme court has stated that "a modern hospital, with rare exceptions, would find it extremely difficult to operate wholly or predominantly on charitable donations. The fact that a non-profit medical provider relies on funding sources other than contributions or donations cannot negate its overriding charitable purpose." *George*, 337 Ark. at 214, 987 S.W.2d at 714. It is evident that there were no facts in dispute under the sixth factor, and the supreme court has made it clear that simply because a hospital relies on sources other than contributions or donations does not necessarily negate its charitable status. Again, the parties have differing interpretations.

The seventh factor is whether CrossRidge offers services free of charge to those unable to pay. CrossRidge directs us to its financial-assistance policy, which states:

> In accordance with its stated mission, [CrossRidge] is committed to providing financial assistance to people who are uninsured, underinsured, ineligible for a government program, or otherwise unable to pay for emergency and other medically necessary care. [CrossRidge] will provide care of emergency medical conditions to individuals regardless of their ability to pay.

> In providing education, treatment, and healthcare services [CrossRidge] believes financial matters are secondary to the rendering of these services. No person who seeks these services is turned away. [CrossRidge] assists needy patients including the truly "indigent" who have no ability to pay and no outside payment sources, eligible patients whose resources or outside payment sources are not sufficient to adequately cover their care, and those who have the ability to pay but require the extension of credit.

Hutchison's affidavit stated that from 2015 to 2017, the cost of charity care provided by CrossRidge was $1,819,984, which equates to 292% of its net income over that period. Hutchison was careful to explain that this was not the forgiveness of bad debt but was the

amount expended for low-income patients who did not have the ability to pay. Hutchison explained that the charity extended by CrossRidge is consistent with its financial-assistance policy. Hutchison stated that CrossRidge never pursues legal action against a charity patient. He also stated that, during the same three-year time frame, CrossRidge separately listed $1,153,968 in bad debt but that this debt was a result of patients who could pay their bills but nonetheless refused to pay. CrossRidge argues that it satisfied factor seven because it provides free and discounted services to those who are unable to pay.

In meeting proof with proof, Cheney offered no evidence to attack Hutchison's testimony on the seventh factor. Instead, Cheney only offered an argument that CrossRidge's policy to provide emergency medical care regardless of a patient's ability to pay merely equates to CrossRidge's doing something that it is already required to do pursuant to federal law. *See* 42 U.S.C. § 1395dd. Essentially, Cheney contends that an emergency charge for a patient who cannot pay is classified as "bad debt" and then CrossRidge converts the bad debt into "charity," which allows it to avoid tort liability as a charitable entity. However, the parties here are arguing for different interpretations of undisputed facts, which is an issue to be determined by the trial court.

The eighth factor is whether CrossRidge's directors and officers receive compensation. CrossRidge's directors are not compensated, but it does not dispute that its officers are compensated. CrossRidge compensates its administrator, Gary Sparks, with annual compensation of around $180,000. CrossRidge also pays for 4.35% of the salaries of CFO Hutchison and the CEO, Chris Barber. These facts are not in dispute, but our supreme court has held that it is not necessary for charitable organizations to have entirely

volunteer staff and management. *See George, supra.* Again, Cheney has a different interpretation of these undisputed facts.

Finally, although not listed as one of the *Masterson* factors, this court has held that another relevant consideration is whether the charitable form has been abused. *See Watkins, supra.* With respect to this issue, the only argument raised by Cheney is that CrossRidge's profit motive and anti-charitable behavior is best demonstrated by its collection practices and treatment of Medicaid recipients with injuries arising from automobile accidents. However, CrossRidge's collection practices in this regard are not in dispute. In such cases, CrossRidge does not immediately accept the Medicaid benefits but instead pursues subrogation efforts with respect to the injured person's tort claims when there may be third-party insurance coverage. In Hutchison's testimony, he made it clear that no collection efforts are taken against the Medicaid patient, and he explained that this collection method was simply a way of attempting to find some sort of payment source. CrossRidge argues that it is required to take such collection efforts before submitting a claim to Medicaid and that this does not alter its undisputed profit margins or demonstrate anti-charitable behavior. Here, again, there are not disputed facts; rather, there are different interpretations of undisputed facts.

Having reviewed the evidence, we hold that the trial court erred in finding that there were material disputed facts with respect to CrossRidge's claim of charitable immunity. Our conclusion is not necessarily that it was error to deny summary judgment on the merits of charitable immunity but rather that the trial court erred in deciding that the issue of charitable immunity would proceed to trial. Applying the framework outlined by the

14

supreme court in *Neal III*, *supra*, we conclude that this case involves differing legal interpretations of undisputed facts. In such cases, the trial court should grant summary judgment when reasonable persons could not reach different conclusions based on the undisputed facts. *Neal III*, *supra*. Therefore, we reverse and remand for the trial court to decide, on the undisputed facts, whether CrossRidge is entitled to charitable immunity.

Reversed and remanded.

VIRDEN and WHITEAKER, JJ., agree.

HARRISON, C.J., concurs.

GLADWIN and BROWN, JJ., dissent.

**BRANDON J. HARRISON, Chief Judge, concurring**. I join the majority opinion but do so with some hesitation. The hesitancy resides chiefly in the decision to remand the case to the circuit court so that it can determine whether to confer charitable immunity upon CrossRidge. The appearance of the "abuse of the corporate form" factor, in a case far outside the context in which that factor was first created and applied, also gives me pause.

The majority opinion holds that there is no genuine issue of material fact in dispute. I agree. Consequently, the only remaining question is this: "Given the facts, should CrossRidge receive charitable immunity?" Today we remand the case so that the circuit court will answer this binary yes-or-no question. This is not the most efficient way forward. This court could answer that question right now, however the votes may fall. A remand is not precluded by law for any reason I can see; but nor is a remand required in my view of the law.

15

As a practical and theoretical matter, the party who disapproves of the circuit court's decision on remand, whatever it may be, will have to pursue a second appeal on the same topic (charitable immunity) if the aggrieved party hopes for a different result in round two. Assuming for the sake of argument that CrossRidge receives charitable immunity on remand, then Special Administrator Cheney could appeal that decision. This court would then review de novo the circuit court's second immunity-related decision. But what criterion or criteria would guide us as we determined whether the circuit court erred in round two? We will have no more material facts then than we do now. We will to a high degree of confidence have the same caselaw in round two that we do here in round one. Why wait? The same of course holds true if Special Administrator Cheney prevails in round two, meaning the circuit court decides not to immunize CrossRidge. If that happens, then the hospital can appeal, and we have the same situation I just mentioned.

Perhaps the Arkansas Supreme Court will one day clarify that an appellate court should decide to confer immunity or not if it has decided that there are no genuine issues of material fact in dispute. Deciding the ultimate question in the first appeal avoids two appeals. I see no need to construct a process that requires two appeals to decide one legal issue (immunity) if the ultimate question is ripe for a final answer in the first appeal. This just makes sense when an appellate court has all it needs in the first appeal to go the distance and declare a "final answer" on the ultimate question. *See White River Health Sys., Inc. v. Long*, 2018 Ark. App. 284, at 9, 551 S.W.3d 389, 393 (Harrison, J., dissenting) (The process and procedure relating to charitable-immunity decisions should be simpler and more streamlined.).

The second point that gives me pause in the majority's opinion—though to a lesser degree than the disposition—is the increasingly widespread use of what I have previously called the "ninth factor," also known as the "abuse of the corporate form" factor. This court created that factor and added it to the eight *Masterson* factors in *Watkins v. Arkansas Elder Outreach of Little Rock, Inc.*, 2012 Ark. App. 301, 420 S.W.3d 477. It is worth pointing out that the Arkansas Supreme Court has not yet formally adopted or applied the so-called ninth factor. *Progressive Eldercare Servs.-Saline, Inc. v. Cauffiel*, 2016 Ark. App. 523, at 11, 508 S.W.3d 59, 67 (Harrison, J., concurring). In fact, in the most recent case from our supreme court on charitable immunity, the court did not reference the "abuse of the corporate form" factor; instead, it kept to the eight *Masterson* factors. *See, e.g.*, *Davis Nursing Home Ass'n v. Neal*, 2019 Ark. 91, 570 S.W.3d 457 (*Neal III*) (addressing only the eight *Masterson* factors).

The ninth factor has gained some steam here today because the majority opinion addresses it. I understand why it did so. Nonetheless, it is worth stating that the "abuse of the corporate form" factor was created in, and applied to, a highly specific record while reviewing a business entity's convoluted corporate structure and weblike operations. *See Watkins*, *supra*. My point is that the "abuse of the corporate form" factor should not be applied as a matter of course to every entity that seeks charitable immunity. Unless and until the Arkansas Supreme Court adopts the "abuse of the corporate form" factor and directs that it must be applied to every charitable-immunity case, I hesitate to give it more influence than it deserves.

17

★ ★ ★

Despite the stated reservations, I join the majority's decision to direct the circuit court to decide on remand whether CrossRidge is entitled to receive charitable immunity. And the circuit court must do so based on the record as it existed when the circuit court denied CrossRidge's motion for summary judgment.

**WAYMOND M. BROWN, Judge, dissenting**. The majority is of the opinion the circuit court erred in its finding that there are disputed facts as to whether the doctrine of charitable immunity applies. Having concluded this case involves only the legal interpretation of undisputed facts, the majority remands the case to the circuit court to enter judgment on the merits of the charitable-immunity issue. For the following reasons, I respectfully dissent from the majority opinion.

In *Davis v. Neal*, our supreme court set forth the standard of review we are bound to follow in reviewing these charitable-immunity cases on summary judgment.[1] In that case, the court explained:

> [I]n some cases, while there may be fact issues involved, they are not matters of disputed fact. Rather they are differing legal interpretations of undisputed facts. . . . In such cases, the circuit court should grant summary judgment where reasonable persons would not reach different conclusions based upon those undisputed facts.
>
> . . . .
>
> If the existence of charitable immunity turns on disputed factual issues, then the jury may determine the facts, and the circuit court will subsequently determine whether those facts are sufficient to establish charitable immunity.[2]

---

[1] 2019 Ark. 91, at 6–8, 570 S.W.3d 457, 461–62 (*Neal III*).

[2] *Id.* at 6–8, 570 S.W.3d at 461-62.

18

Frequently in these charitable-immunity cases, the facts are not in dispute. Nevertheless, our supreme court has deemed summary judgment inappropriate when reasonable persons could reach different conclusions based on undisputed facts. Clearly, summary judgment is even less appropriate when there are disputed issues of material fact.

Here, the circuit court determined that summary judgment was not appropriate because there were material facts in dispute as to whether the doctrine of charitable immunity applies. I would affirm the circuit court because there are several *Masterson* factors upon which reasonable minds could disagree. I direct your attention to factors (3), (4), (5), (7), and (8): (3) whether CrossRidge's goal is to break even; (4) whether CrossRidge earned a profit; (5) whether any profit or surplus must be used for charitable purposes; (7) whether CrossRidge provides its services free of charge to those unable to pay; and (8) whether CrossRidge's directors and officers receive compensation.

Regarding factors (3) and (4), CrossRidge admits that it does not strictly seek to break even; however, in evaluating the *Masterson* factors, our court has held that the lack of a profit in a long-standing business could cause reasonable minds to question whether an entity is truly operating at a deficit each year or simply creating a presumption of a deficit.[3] The affidavit of CrossRidge's chief financial officer reflects that CrossRidge's operations do not support the total costs of running the hospital and is currently running on a deficit of $4 million despite being incorporated since 1999. In light of our prior holding and the facts before our court, I would find that reasonable minds could differ on whether CrossRidge

---

[3]*Neal v. Davis Nursing Ass'n*, 2015 Ark. App. 478, 470 S.W.3d 281 (*Neal I*).

19

is truly operating at a deficit and thus is a factual question in dispute precluding summary judgment.

Similarly, regarding factor (5), we have held that a question of fact remains as to whether reinvesting profits, as CrossRidge admittedly does, is sufficient to show that it uses profits and surplus for charitable purposes.[4] Therefore, I would hold that whether CrossRidge's reinvestment can be characterized as perpetuating its charitable-community benefit of providing medical assistance to the public is a factual question on which reasonable minds could disagree. Additionally, factor (8)—whether CrossRidge's officers and directors are compensated—involves a determination of what constitutes "reasonable" because CrossRidge's officers admittedly receive compensation for services rendered, and it has long been held that whether something is reasonable is a question of fact precluding summary judgment.[5]

Whether CrossRidge provides its services free of charge to those unable to pay (factor 7) is where I find the greatest source of discord with the majority's opinion. Here we have an entity whose financial assistance policy (FAP) states that it employs external collection agencies to pursue collection actions against patients who do not pay. To be clear, the FAP expressly states as follows:

> [CrossRidge] and its external collection agencies may also take any and all legal actions including, but not limited to, telephone calls, emails, mailing notices, and skip tracing to obtain payment for medical services provided.

---

[4]*Neal I*, 2015 Ark. App. 478, at 5–6, 470 S.W.3d at 284.

[5]*Watkins v. Ark. Elder Outreach of Little Rock, Inc.*, 2012 Ark. App. 301, 420 S.W.3d 477.

> [CrossRidge] will make a reasonable effort to orally communicate with the patient/grantor about its FAP and about how assistance may be obtained with the FAP application process before an account is turned over to a collection agency and reports as a negative item with a credit bureau.

Therefore, while CrossRidge ultimately forgives some debt, it admits patients with the presumption they will pay their bill; all patients admitted are initially charged for their care, and only when they cannot pay or do not pay are those debts forgiven.

Despite the express language of its own internal policy, CrossRidge contends it only engages in collection practices with respect to patients injured in motor-vehicle accidents. Is that what its policy states? No. Do we know what "reasonable effort[s]" are made to communicate with the patient before an account is turned over to a collection agency? No. If CrossRidge does not utilize this collections provision of its own FAP, then why have such a policy? It is hard to comprehend how the majority discounts these clear issues of material fact. Does CrossRidge offer free care or simply equate forgiveness of uncollectible debt to providing free services?

This factor undoubtedly presents a factual question on which reasonable minds could reach different conclusions and cannot be regarded as simply an interpretation of an undisputed fact. In fact, I would go even further to say that the facts surrounding the seventh *Masterson* factor involve not only facts upon which reasonable minds could reach a different conclusion but also disputed facts regarding whether CrossRidge provides its services free of charge. This alone should preclude an entry of summary judgment, as it presents a factual issue for the jury.

21

Our court must follow the precedent set by the supreme court; however, rather than applying the standard set forth in *Neal III,* the majority tells our supreme court how it wants it to be and expands *Neal III* beyond its scope. I offer no opinion as to whether CrossRidge is a genuine charitable organization. My intent is merely to express that this is not a situation "where reasonable persons would not reach different conclusions based upon those undisputed facts"; therefore, summary judgment is inappropriate.[6] I simply cannot agree with the majority's interpretation of *Neal III* and consequently must respectfully dissent.

GLADWIN, J., joins.

*Waddell, Cole & Jones, PLLC*, by: *Paul D. Waddell* and *Samuel T. Waddell*, for appellant.

*Wilcox Law Firm*, by: *Tony L. Wilcox* and *Blake W. Wilcox*, for appellee.

---

[6]*Neal III*, 2019 Ark. 91, at 7, 570 S.W.3d at 461.