Cite as 2022 Ark. App. 239

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-20-77

CAMDEN PROGESSIVE ELDERCARE
SERVICES, INC., D/B/A OUACHITA
NURSING AND REHABILITATION
CENTER

APPELLANT

V.

SHEILA WHITNEY, AS PERSONAL
REPRESENTATIVE OF THE ESTATE
OF LILLIE WHITNEY, AND ON
BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF LILLIE WHITNEY

APPELLEE

Opinion Delivered May 18, 2022

APPEAL FROM THE OUACHITA
COUNTY CIRCUIT COURT
[NO. 52CV-17-158]

HONORABLE DAVID F. GUTHRIE,
JUDGE

REVERSED AND REMANDED

## KENNETH S. HIXSON, Judge

This is an appeal from an order denying summary judgment on charitable immunity

in a nursing-home-negligence case.[1]  The appellee, the estate of Lillie Whitney[2] (Whitney),

filed a lawsuit against appellant, Camden Progressive Eldercare Services, Inc., d/b/a

---

[1]As a general rule, the denial of a summary-judgment motion is neither reviewable
nor appealable.  *Ark. Elder Outreach of Little Rock, Inc. v. Thompson*, 2012 Ark. App. 681, 425
S.W.3d 779.  The general rule does not apply, however, where the refusal to grant a summary-
judgment motion has the effect of determining that the appellant is not entitled to its defense
of immunity from suit because the right of immunity from suit is effectively lost if a case is
permitted to go to trial.  *Id.*  Therefore, the order denying summary judgment is appealable.

[2]Sheila Whitney, as personal representative of the estate of Lillie Whitney, and on
behalf of the wrongful death beneficiaries of Lillie Whitney.

Ouachita Nursing and Rehabilitation Center (Camden PES), alleging negligence, medical malpractice, breach of admission agreement, breach of provider agreement, and violations of the Arkansas Deceptive Trade Practices Act. Camden PES filed a motion for summary judgment, arguing that it was entitled to charitable immunity. The trial court denied the motion for summary judgment, finding that there were issues of material fact as to whether Camden PES was entitled to charitable immunity. Camden PES appealed. We hold that the trial court erred in finding that issues of material fact existed, and we reverse and remand for the trial court to decide whether Camden PES is entitled to charitable immunity on the undisputed facts.

*Facts and Procedural History*

Lillie Whitney was a resident of Camden PES from June 1, 2015, until August 16, 2016, and she passed away on August 18, 2016. After Lillie's death, her daughter was appointed as personal representative of Lillie's estate and sued Camden PES and numerous other entities for negligence and other causes of action related to Lillie's care and treatment while living at Camden PES.[3]

---

[3]The others sued include Southern Administrative Services, LLC (the facility's administrative services company); Care Plus Staffing , LLC (which provides staffing services and employs the nursing staff at the facility); ProCare Therapy Services, LLC (the facility's physical- and occupational-therapy provider); Professional Nursing Solutions, LLC (which provides nurse-consultant services to the facility); Ponthie Holdings, LLC; JEJ Investments, LLC; John Ponthie; Ross Ponthie; Mark Thompson; and Angela Marlar, in her capacity as Administrator of Ouachita Nursing and Rehabilitation Center.

Camden PES is incorporated under the Arkansas Nonprofit Corporation Act and operates a nursing home doing business as Ouachita Nursing and Rehabilitation Center. Camden PES's articles of incorporation state that the corporation "embraces the culture change model of care and will foster the statewide development of person-centered care in long-term care facilities to ensure elders attain or maintain their highest practicable level of well-being."

Camden PES filed a motion for summary judgment, claiming that it was immune from suit based on the doctrine of charitable immunity. Camden PES attached exhibits in support of its motion, which included its Medicaid cost reports and its articles of incorporation. Camden PES also attached three affidavits in support of its motion. These affidavits are summarized as follows.

Richard V. Urquhart is a certified public accountant who was engaged by Camden PES as an expert witness. Urquhart stated in his affidavit that he has forty-seven years' experience in public accounting and management positions with health-care companies, and that throughout his career, he has routinely performed audits and cost-report analyses. Urquhart analyzed Camden PES's Medicaid cost reports from September 2015 to June 2018 as well as other financial documentation related to Camden PES's operations in formulating his expert opinions. Urquhart also reviewed financial information for other long-term-care facilities operating in Arkansas to compare Camden PES's operations to other comparable facilities.

Urquhart stated that between September 2015 and June 2018, Camden PES sustained an overall loss of 5.45 percent, whereas other comparable for-profit facilities gained an average of 2.56 percent to 4.99 percent. Urquhart also stated that he had reviewed the service agreements between Camden PES and Southern Administrative Services, ProCare Therapy Services, and Care Plus Staffing and that these types of services are consistent with services typically obtained by similar nursing-home entities. Urquhart gave the opinion that Camden PES is paying reasonable, arms-length rates for these services. Finally, Urquhart stated that between September 2015 and June 2018, Camden PES reported a total expense for free care to residents—meaning amounts that it recognized would not be paid—of $307,000.

Jeff Harrington has served as regional vice president for Southern Administrative Services and has worked with the charitable-care committee for Camden PES since September 2015. In his affidavit, Harrington stated:

> Most Ouachita Nursing residents qualify for Medicare or Medicaid coverage, but Ouachita Nursing still provided free care to residents who did not qualify for Medicare or Medicaid. Ouachita Nursing provides health-care services to residents, up front, without any guarantee of future payment for services. In some instances, Ouachita Nursing did not receive payment for its services, and continued to provide services knowing that it would not be able to collect payment. In other words, Ouachita Nursing was willing to accept residents, and in fact did accept residents, who were unable to pay for services.

Harrington's affidavit provided numerous specific examples of free health care provided to Camden PES's residents. Harrington also stated that to the best of his belief, during his time working with Camden PES the facility had not filed a lawsuit against a resident to

4

collect a debt; had never turned a resident over to a collection agency; and had treated all residents uniformly regardless of their ability to pay.

Camden PES also submitted the affidavit of Angela Marlar. Marlar is a former board member and administrator for Camden PES. Marlar stated that the board members receive no compensation. Marlar did, however, receive $84,988.80 in annual compensation for her position as administrator.

Whitney opposed Camden PES's motion for summary judgment, arguing that there were factual questions as to Camden PES's charitable status. In support of its opposition to summary judgment, Whitney attached the affidavit of John C. Langham, a certified public accountant who specializes in all aspects of accounting and auditing and has experience with the accounting functions of charitable organizations and nursing homes. Langham gave the opinion that Camden PES does not act as a charitable entity but rather operates as a for-profit entity in the same manner as other similar for-profit nursing homes.

In his affidavit, Langham stated he reviewed numerous financial records—which primarily focused on records pertaining to the 2016 tax year—related to Camden PES and its operation of the nursing home. Langham's interpretation of the financial documents he reviewed was that Camden PES was created as a shell entity to pass profits off to other related entities in order to maintain charitable status. Langham further opined that Camden PES does not act as a charitable entity but rather operates Ouachita Nursing and Rehabilitation Center in the same manner as other similar for-profit nursing homes. Langham then

5

proceeded to give various examples in support of his opinion that Camden PES does not operate as a truly charitable entity but instead funnels its profits to related entities.

Generally, Langham's affidavit focused on two areas. First, Langham discussed Camden PES's participation in a captive insurance program for its liability-insurance coverage. Second, Langham discussed four specific independent contractors that provide staffing, services, or supplies for Camden PES, which Langham opines are related entities.

Langham stated that Camden PES appears to use a related "captive-insurer" for its professional-liability insurance, which is consistent with a for-profit entity. Langham explained:

> Camden-PES, Inc. also appears to be a for profit entity based on the fact that the company appears to utilize a related "Captive Insurer" for its professional liability insurance. Based on Camden-PES, Inc.'s Arkansas cost report for the period ended June 30, 2017, Camden-PES, Inc. paid $365,934 for professional liability insurance despite the fact that they only had insurance coverage in the amount of $250,000 per occurrence and $750,000 aggregate. The cost of the insurance coverage seems extremely high for the amount of coverage provided which is consistent with the utilization of a "Captive Insurer." Based on my experience, utilization of a related "Captive Insurer" generally involves the operating company, Camden-PES, Inc., paying and deducting excessively high insurance premiums to the related "Captive Insurance" company. The premiums paid are high compared to the amount of coverage provided. The related "Captive Insurance" company enjoys the tax benefit of being able to exclude its first $1 million dollars in premium income from ordinary income tax. Camden-PES, Inc. is only one of at least 26 Arkansas facilities believed to utilize the same "Captive Insurer" which were organized by John Ponthie and Amy Wilbourn similarly to Camden-PES, Inc. The owners of the "Captive Insurance" company then recover those excess premiums at a later date as capital gain income upon the liquidation of the "Captive Insurance" company. Said income is then taxed only as capital gains instead of ordinary income representing a significant tax savings. Utilization of a "Captive Insurer" is consistent with a for-profit entity.

6

Langham then discussed the manner in which Camden PES paid and accounted for third-party services provided to the facility. In particular, Langham discussed Camden PES's relationship with Care Plus Staffing, ProCare Therapy Services, Southern Administrative Services, and Professional Nursing Solutions.[4] Upon review of these records, Langham opined that these four entities were *related entities* to Camden PES, but the relationship was undisclosed on certain IRS forms. Langham stated:

> Four of the five entities listed as Independent Contractors on Camden PES's IRS Form 1023, Part V, Line 1c, appear to be related to Camden PES through business relationships as disclosed on Attachment 14 (Schedule G) . . . . They appear to have been incorporated by and have the same registered agent as Camden PES . . . as well as ten other entities named Progressive Eldercare Services for 25 other Arkansas locations, 19 of which list John Ponthie or Amy Wilbourn as the incorporator/organizer. Attorney Amy Wilbourn . . is listed as the registered agent for all of these entities. On IRS form 1023, Part V, Line 2a - the question asks "are any of your officers, directors, or trustees related to each other through family or business relationships?" The question is answered, "no.". . . Likewise, on IRS form 1023, Part V, Line 2c - the question asks "are any of your officers, directors or trustees related to your highest compensated employees or highest compensated independent contractors listed on lines 1b or 1c through family or business relationships?" The question is answered "no." However, in Attachment 14 (Schedule G) of the same document, Camden PES lists four of the five Independent Contractors listed on Line 1c as being related entities. Therefore, it appears that . . . Care Plus Staffing, ProCare Therapy Services, Southern Administrative Services, and Professional Nursing Solutions are all related business entities to Camden PES.

Then Langham concluded:

> Another example that appears to be Camden PES funneling profit to related entities can be seen by reviewing the Arkansas DHS Cost Report for the period from 7/1/16– 6/30/17 and the IRS Form 990 Income Tax Return for 2016. The cost report indicates $6,864,379 in total revenue and $6,924,885 in total expenses. In the

---

[4]These are the same entities (plus one more) that Richard V. Urquhart referred to in his affidavit wherein he concluded that these were arms-length transactions and that the rates paid by Camden PES to these entities are reasonable in the industry.

expense section, Column 3 "Related Party Expense Adjustment," an entity is supposed to reduce any profit from dealing with related parties in arriving at "Allowable Expenses." No entries have been made despite the fact that on IRS Form 1023, Attachment 14 (Schedule G), Camden-PES, Inc. lists four "Independent Contractors" on item 1c as being related entities. These "related entities" include Care Plus Staffing, ProCare Therapy Services, Southern Administrative Services, and Professional Nursing Solutions.

Langham stated that, according to the IRS Form 990 Income Tax Return for 2016, the amount paid to the "Independent Contractors" was $4,239,574, which amounts to about 60 percent of Camden PES's total expenses being paid to the four entities related to Camden PES. Langham opined that this is, at best, disingenuous and, at worst, tantamount to Medicaid fraud. The implication from Langham's opinion as expressed in his affidavit was that Camden PES was paying higher than reasonable fees and rates to these four related entities which, in effect, funneled profits that should be attributable to Camden PES to the four related entities in order to maintain Camden PES's charitable status.

The trial court entered an order denying Camden PES's motion for summary judgment. In its order the trial court found:

> NOW BEFORE the court is the motion of Defendant's Camden-Progressive Eldercare Services for summary judgment on the issue of charitable immunity and from the pleadings, argument of counsel and its review, the court finds *that issues of material fact exist* and that the motion should be denied.

(Emphasis added.) Camden PES timely appealed from the trial court's order denying summary judgment, and it argues on appeal that it established entitlement to charitable immunity as a matter of law.

*Discussion*

8

We set forth the following considerations with respect to the charitable-immunity doctrine in *St. Bernard's Community Hospital Corp. v. Cheney*, 2021 Ark. App. 236, at 5, 625 S.W.3d 398, 403:

> The essence of the charitable-immunity doctrine is that organizations such as agencies and trusts created and maintained exclusively for charity may not have their assets diminished by execution in favor of one injured by acts of persons charged with duties under the agency or trust. *George v. Jefferson Hosp. Ass'n*, 337 Ark. 206, 987 S.W.2d 710 (1999). Charitable immunity is immunity from suit, not simply immunity from liability. *See Low v. Ins. Co. of N. Am.*, 364 Ark. 427, 220 S.W.3d 670 (2005). Immunity from suit is an entitlement not to stand trial or face the other burdens of litigation, while immunity from liability is a mere defense to a suit. *See Robinson v. Beaumont*, 291 Ark. 477, 725 S.W.2d 839 (1987). Because the charitable-immunity doctrine favors charities and results in a limitation of potentially responsible persons whom an injured party may sue, we give the term "charitable immunity" a narrow construction. *Williams v. Jefferson Hosp. Ass'n*, 246 Ark. 1231, 442 S.W.2d 243 (1969).

> In *Masterson v. Stambuck*, 321 Ark. 391, 902 S.W.2d 803 (1995), the supreme court set forth several factors to determine whether an organization is entitled to charitable immunity. These factors are:

> (1) whether the organization's charter limits it to charitable or eleemosynary purposes; (2) whether the organization's charter contains a "not-for-profit" limitation; (3) whether the organization's goal is to break even; (4) whether the organization earned a profit; (5) whether any profit or surplus must be used for charitable or eleemosynary purposes; (6) whether the organization depends on contributions and donations for its existence; (7) whether the organization provides its services free of charge to those unable to pay; and (8) whether the directors and officers receive compensation.

*Id.* at 401, 902 S.W.2d at 809. These factors are illustrative, not exhaustive, and no single factor is dispositive of the charitable status. *Id.* at 401, 902 S.W.2d at 810. Our court has also held that a pivotal issue in determining one's entitlement to charitable immunity is

9

whether the charitable form has been abused. *Watkins v. Elder Outreach of Little Rock*, 2012

Ark. App. 301, 420 S.W.3d 477.

The previous summary-judgment standard in a charitable-immunity case was set forth

by the supreme court in *Anglin v. Johnson Regional Medical Center*, 375 Ark. 10, 15, 289 S.W.3d

28, 31 (2008):

> The law is well settled that summary judgment is to be granted by a circuit court only
> when it is clear that there are no genuine issues of material fact to be litigated, and
> the party is entitled to judgment as a matter of law. Once the moving party has
> established a prima facie entitlement to summary judgment, the opposing party must
> meet proof with proof and demonstrate the existence of a material issue of fact. On
> appellate review, we determine if summary judgment was appropriate based on
> whether the evidentiary items presented by the moving party in support of the motion
> leave a material fact answered.

(Citations omitted.)

However, in 2019 the *Anglin* summary-judgment standard was substantially altered in

charitable-immunity cases by the supreme court in *Davis Nursing Home Ass'n v. Neal*, 2019

Ark. 91, 570 S.W.3d 457 (*Neal III*).[5]  In *Neal III*, the supreme court held that although

*disputed factual* issues concerning an organization's charitable status may be presented to a

jury, the ultimate question of charitable immunity remains a matter of law for the court to

decide. Here is the operative language in *Neal III*:

> In some cases, while there may be fact issues involved, they are not matters of disputed
> fact. Rather they are differing legal interpretations of undisputed facts. In such cases,
> the circuit court should grant summary judgment where reasonable persons would
> not reach different conclusions based upon those undisputed facts.

[5]As we explained in *St. Bernard's*, *supra*, we refer to this supreme court opinion as *Neal III* because it was the third in a line of appellate decisions with respect to the dispute between the parties therein.

. . . .

> If the existence of charitable immunity turns on disputed factual issues, then the jury may determine the facts and the circuit court will subsequently determine whether those facts are sufficient to establish charitable immunity.

*Neal III*, 2019 Ark. 91, at 6–8, 570 S.W.3d at 461–62 (citations omitted).

The threshold question in the *Neal III* framework is whether there are *disputed material facts* or whether there are *undisputed facts with differing interpretations*. If there are disputed material facts regarding charitable immunity, then summary judgment is improper because these disputed facts must be submitted to the jury for its findings. Then, in a procedure left unexplained in *Neal III*, the trial court uses the jury's findings of fact to make its determination of whether the defendant is entitled to charitable immunity as a matter of law. If, however, there are undisputed facts and merely differing interpretations of those facts, then summary judgment is proper if reasonable persons could not reach different conclusions based on those undisputed facts.

In this case, the trial court denied Camden PES's motion for summary judgment after finding that issues of material facts existed as to Camden PES's claim of charitable immunity. However, we conclude that the trial court erred in finding that there were disputed issues of material fact. Rather, our review of the record reveals that the facts in this case were undisputed with merely different interpretations. Therefore, in the summary-judgment proceeding, *Neal III* requires the trial court to determine whether Camden PES was entitled to charitable immunity on these undisputed facts as a matter of law.

11

In determining whether Camden PES was entitled to summary judgment on charitable immunity, we must review the *Masterson* factors as they relate to the evidence presented. The first two factors are (1) whether the organization's charter limits it to charitable or eleemosynary purposes; and (2) whether the organization's charter contains a "not-for-profit" limitation. Here, Camden PES's articles of incorporation classify the entity as a "public benefit corporation," which is defined by the Arkansas Nonprofit Corporation Act as one formed "to perform good works, to benefit society or improve the human condition." *See* Ark. Code Ann. § 4-33-140(29) (Repl. 2016). The articles of incorporation further provide that Camden PES "is organized exclusively for charitable, religious, educational, and scientific purposes." Camden PES is tax exempt, and its articles of incorporation provide that it is "organized under the Arkansas Nonprofit Act." They also state that the corporation is prohibited from engaging in activities inconsistent with federal nonprofit tax status. These facts were not disputed.

The third factor is whether the organization's goal is to break even, and the fourth factor is whether the organization earned a profit. Camden PES's articles of incorporation state that the financial goal of the corporation is to break even. Urquhart stated in his affidavit that for the period from September 2015 to June 2018, Camden PES sustained a loss of 5.45 percent. However, in Langham's affidavit, he opined that Camden PES's organizational and accounting framework is designed to show a loss and that it actually operates as a for-profit nursing home. The opinions formulated by Urquhart and Langham were not based on disputed issues of fact but were instead differing interpretations of

12

undisputed factual documentation. That being so, these were not issues for a jury but were rather for the trial court to decide under the *Neal III* framework.

The fifth factor is whether any profit or surplus must be used for charitable or eleemosynary purposes. Camden PES's articles of incorporation provide, "No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, its members, trustees, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth herein." No further proof was offered on this factor.

The sixth factor is whether the organization depends on contributions and donations for its existence. Camden PES put on no proof of any contributions or donations, and it conceded in its brief in support of its summary-judgment motion that it does not rely on charitable contributions to operate. However, Camden PES cites *George v. Jefferson Regional Medical Center*, 337 Ark. 206, 987 S.W.2d 710 (1999), where the supreme court stated that "a modern hospital, with rare exceptions, would find it extremely difficult to operate wholly or predominantly on charitable donations. The fact that a non-profit medical provider relies on funding sources other than contributions or donations cannot negate its overriding charitable purpose." *George*, 337 Ark. at 214, 987 S.W.2d at 714.

The seventh factor is whether Camden PES offers services free of charge to those unable to pay. Harrington stated in his affidavit that Camden PES provides health-care services to residents who are unable to pay and that Camden PES never takes legal action

13

against a nonpaying resident. Urquhart in his affidavit noted that between September 2015 and June 2018, Camden PES gave $307,000 in free care to residents.

Whitney counters Camden PES's claim of free care by noting that, from the financial documents presented, the $307,000 Camden PES claims to have given in free care from September 2015 to June 2018 represents only 4.4 percent of the revenue generated by Camden PES in a single year—2016. Langham stated in his affidavit that "given the millions of dollars in revenue generated by Camden-PES, Inc., I found no evidence of significant services being offered free of charge or to those unable to pay." Whitney further notes that Camden PES's admission agreement does not inform indigent residents of their option to receive free or reduced-cost care, and instead requires timely payment by the first of each month or the resident is subject to being discharged. The parties here again are arguing different interpretations of undisputed facts, which is an issue to be determined by the trial court.

The eighth factor is whether the organization's directors and officers receive compensation. Camden PES's board members receive no compensation, but Camden PES compensates its administrator with annual compensation of around $85,000 a year. These facts are not in dispute, but the supreme court has held that it is not necessary for charitable organizations to have entirely volunteer staff and management. *See George*, *supra*.

Additionally, as we stated above, although it is not listed as one of the *Masterson* factors, this court has held that another relevant consideration is whether the charitable form has been abused. *See St. Bernard's*, *supra*. In *Watkins v. Elder Outreach of Little Rock*, 2012 Ark.

14

App. 301, 420 S.W.3d 477, we held that this is a pivotal issue in determining one's entitlement to charitable immunity.

Before addressing the issue of abuse of the charitable form as it relates to this case, we first address Camden PES's threshold argument that this issue should not be considered in our analysis because it has never been expressly adopted by the supreme court as a one of the charitable-immunity factors. We disagree with this argument. We note that when the supreme court delivered *Masterson* in 1995, it held that the eight factors listed are illustrative and not exhaustive. Moreover, after our court delivered *Watkins* in 2012, we have consistently engaged in an analysis of whether there has been abuse of the charitable form when deciding charitable-immunity cases. *See, e.g., St. Bernard's, supra; Progressive Eldercare Services-Saline v. Cauffiel*, 2016 Ark. App. 523, 508 S.W.3d 59. We have applied the abuse-of-the-charitable-form consideration for ten years with no rebuke from the supreme court, and therefore, we apply it here.

In *Neal v. Davis Nursing Home Ass'n*, 2015 Ark. App. 478, 470 S.W.3d 281 (*Neal I*), we stated that the flow of money and the relationship between the facility and other service providers can be critical to determining whether an entity is truly charitable or merely a conduit through which to funnel money and divert profits. In *Cauffiel, supra*, we stated that the abuse-of-the-charitable-form analysis was derived directly from the third, fourth, and fifth *Masterson* factors, where the analysis is focused on the organization's profits.

Camden PES submitted evidence that the charitable form was not being abused. In this regard, Urquhart gave the opinion that according to his analysis, it appeared that

Camden PES was paying reasonable, arms-length rates for the services provided by its suppliers and vendors, including Southern Administrative Services, ProCare Therapy Services, and Care Plus Staffing.

However, Whitney's expert, Langham, offered a contrasting opinion. Langham stated that based on his review of the information made available to him "it is apparent that Camden-PES, Inc. was created as a shell entity to pass profits off to other related entities in order to maintain charitable status." Langham opined that Camden PES "does not act as a charitable entity, but rather operates Ouachita Nursing and Rehabilitation Center in the same manner as other similar for-profit nursing homes." Langham then gave various examples in support of his opinion that Camden PES does not operate as a truly charitable entity but instead funnels its profits to related entities, which include Care Plus Staffing, ProCare Therapy Services, Southern Administrative Services, and Professional Nursing Solutions.

Although the opinions of Urquhart and Langham differed on their respective interpretation of the financial records and their respective opinions on whether the charitable form was being abused, their differences in opinion were not based on disputed facts. Rather, these opinions were different interpretations of undisputed facts. Having the same set of facts before them, Urquhart opined that Camden PES was paying reasonable arms-length rates for third-party services, while Langham implied that the rates to third-party related entities were being inflated to show a loss on paper while Camden PES was actually earning a profit similar to a for-profit nursing home. Again, we have differing interpretations

16

of undisputed facts, and it is for the trial court to decide, under the *Neal III* framework, whether the charitable form was being abused.

Having reviewed the record, we hold that the trial court erred in finding that issues of material fact existed as to whether Camden PES was entitled to charitable immunity. There are no issues of material fact in this case; rather there are different interpretations of undisputed facts. That being so, pursuant to the supreme court's directive in *Neal III*, *supra*, the trial court should grant summary judgment if, upon review of the evidence on remand, the court determines that reasonable persons would not reach different conclusions on the undisputed facts. Our conclusion is not necessarily that it was error to deny summary judgment on the merits of charitable immunity but rather that the trial court erred in deciding that the issue of charitable immunity would proceed to trial on the record presented. *See St. Bernard's*, *supra*.

Finally, we acknowledge that Camden PES also raises one additional argument. Citing *K.C. Properties of Northwest Arkansas, Inc. v. Lowell Investment Partners, LLC*, 373 Ark. 14, 280 S.W.3d 1 (2008), it argues that, in the context of piercing the corporate veil, a court will disregard the corporate façade only when the corporate form has been abused to *the injury of a third party*. Camden PES claims that Whitney failed to show that the charitable form was abused *to her injury*, noting that Whitney is requesting damages that may be available from several other defendants who do not seek charitable immunity. However, to preserve an issue for appellate review, an appellant must specifically raise the argument relied on to the trial court, develop the argument there, and obtain a ruling on the argument.

17

*Evans v. Carpenter*, 2022 Ark. App. 83, 642 S.W.3d 235 . Because Camden PES did not raise this argument below, we do not address it.

*Conclusion*

We reverse and remand because the trial court erred in finding that issues of material fact existed as to whether Camden PES was entitled to charitable immunity. Rather, this case involved differing interpretation of undisputed facts. On remand, the trial court should grant summary judgment if reasonable persons would not reach different conclusions based upon the undisputed facts.

Reversed and remanded.

GRUBER, J., agrees.

WHITEAKER, J., concurs.

**PHILLIP T. WHITEAKER, Judge, concurring**. I agree with the majority that the facts in this case are not in dispute and that the trial court erred in finding that issues of material fact existed. However, I write to express my concern that implementation of the framework espoused in *Davis Nursing Home Ass'n v. Neal*, 2019 Ark. 91, 570 S.W.3d 457 (*Neal III*), may set our traditional summary-judgment standard on its head.

In summary-judgment proceedings, a trial court is tasked with deciding whether questions of material fact exist to be resolved at trial and, in so doing, must avoid weighing and resolving conflicting testimony. *Turner v. Nw. Ark. Neurosurgery Clinic, P.A.*, 84 Ark. App. 93, 105, 133 S.W.3d 417, 424 (2003). In fact, the supreme court has noted that summary judgment is not designed for assessing the probative strength of conflicting proof or expert

18

opinions. *Green v. Alpharma, Inc.*, 373 Ark. 378, 396, 284 S.W.3d 29, 42 (2008). That being said, I believe that the framework set forth in *Neal III* ostensibly requires the circuit court to either resolve the conflicting opinions of the parties' expert witnesses or to weigh their credibility in order to determine whether "reasonable persons" could reach differing conclusions as to the undisputed facts. Thus, our traditional summary-judgment standard may be turned on its head.

*Kutak Rock LLP*, by: *Mark W. Dossett*, *Jeff Fletcher*, and *Samantha Blassingame*, for appellant.

*Reddick Moss, PLLC*, by: *Brian D. Reddick*, *Matthew D. Swindle*, and *Heather G. Zachary*, for appellee.