Cite as 2025 Ark. App. 562

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. CV-23-554

|  |  |
|---|---|
| CAMDEN - PROGRESSIVE ELDERCARE SERVICES, INC., D/B/A OUACHITA NURSING AND REHABILITATION CENTER<br>APPELLANT | Opinion Delivered November 19, 2025<br><br>APPEAL FROM THE OUACHITA COUNTY CIRCUIT COURT [NO. 52CV-17-222] |
| V. | HONORABLE SPENCER G. SINGLETON, JUDGE |
| GLEN ROBINSON, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BIRDIE THOMPSON, AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF BIRDIE THOMPSON<br>APPELLEE | AFFIRMED |

## STEPHANIE POTTER BARRETT, Judge

This is an interlocutory appeal in a nursing-home-negligence case. Appellant Camden - Progressive Eldercare Services, Inc., d/b/a Ouachita Nursing and Rehabilitation Center ("Camden PES") appeals the denial of its motion for summary judgment based on its assertion of entitlement to charitable immunity.[1] For reversal, it argues that the circuit court erred because (1) it is entitled to summary judgment in light of the factors adopted by the

---

[1]The denial of summary judgment here in which the circuit court rejected Camden PES's claim of charitable immunity is an appealable order. *See Ark. Elder Outreach of Little Rock, Inc. v. Thompson*, 2012 Ark. App. 681, at 4, 425 S.W.3d 779, 783.

Arkansas Supreme Court; (2) "abuse of the charitable form" is not a valid factor for consideration in analyzing charitable immunity; and (3) even if abuse of the charitable form is part of the analysis, it did not did not abuse the charitable form. We affirm the circuit court's order.

I. *Background Facts and Procedural History*

Birdie Thompson was a resident of Camden PES from November 2012 until days before she died in January 2017. Following Birdie's death, her son, Glen Robinson, was appointed personal representative of her estate. In September 2017, Robinson, acting on behalf of the estate (hereinafter "Thompson"), filed a nursing-home-negligence lawsuit on behalf of the estate against Camden PES; Progressive Eldercare Services, Inc.; Southern Administrative Services, LLC; Careplus Staffing, LLC; ProCare Therapy Services, LLC; Professional Nursing Solutions, LLC; Ponthie Holdings, LLC; JEJ Investments, LLC; John Ponthie; Ross Ponthie; Mark Thompson; and Angela Marlar, in her capacity as administrator of Ouachita Nursing and Rehabilitation Center. The case arose because of injuries that Birdie had allegedly suffered during her residency at Camden PES.

Camden PES was the licensed operator of the nursing home where Birdie had resided. It was organized as an Arkansas nonprofit corporation and a 501(c)(3) nonprofit. The IRS also designated Camden PES a "public charity" entitled to tax-exempt status under section 501(c)(3) of the Internal Revenue. Camden PES is prohibited from engaging in activities inconsistent with its federal nonprofit tax status under its articles of incorporation.

2

On February 25, 2022, Camden PES moved for summary judgment on the theory of charitable immunity. Camden PES was the only defendant that moved for summary judgment on this basis. It argued that no genuine issues of material fact existed and that it had met its burden of proof on the eight charitable-immunity factors adopted by the supreme court in *Masterson v. Stambuck*, 321 Ark. 391, 902 S.W.2d 803 (1995). In support of its motion, it attached its articles of incorporation, which expressly designates it as a "public benefit corporation" and explains that it is "organized exclusively for charitable, religious, educational, and scientific purposes." The articles of incorporation also preclude its net earnings from inuring "to the benefit of, or be distributed to, its members, trustees, officers, or other private persons," except for reasonable compensation for services and payments and distributions in furtherance of its authorized purposes.

Camden PES also attached an affidavit from Richard Urquhart, a certified public accountant and its expert witness in the matter. Urquhart had reviewed Camden PES's cost reports to the Arkansas Department of Human Services that reflected its financial operations from September 1, 2015, until June 30, 2018. During this time period, Camden PES suffered a net loss of approximately 5.45 percent. Urquhart also reviewed and analyzed publicly available information for all reporting nursing-home facilities operating in the state of Arkansas during the same operations period. He noted that, for comparison purposes,

> the average surplus for facilities within the Statewide category over the same period was 2.72%; the average surplus within the bed-size comparison category over the same period was 2.56%; and the average surplus within the regional category over the same period was 4.99%. The average net loss within the non-profit category over the same period was 1.59%.

3

He concluded that while Camden PES lost 5.45 percent, other comparable for-profit facilities operating throughout the state and region gained on average between 2.56 percent and 4.99 percent.

Additionally, Urquhart reviewed the terms of the service agreements between Camden PES and Southern Administrative Services, ProCare, and Careplus. He concluded that the services provided pursuant to those contracts are consistent with the types of services that are typically obtained by similar nursing-home entities and that the terms of the contracts (including the cost of services) are reasonable and reflect arms-length terms typically entered into by similar organizations. Finally, he noted from Camden PES's cost reports that it was providing a substantial number of services for which it had not been paid. For the cost-reporting period covered by his analysis, Camden PES reported a total expense for free care of approximately $307,000, or $122,800 a year. According to Urquhart, "[T]his tells me that [Camden PES] was providing a large amount of free care to residents."

Camden PES also attached an affidavit from Jeff Harrington, who had served as regional vice president for Southern Administrative Services and had worked with the charitable-care committee for Camden PES since September 2015. Harrington explained:

> Most Ouachita Nursing residents qualify for Medicare or Medicaid coverage, but Ouachita Nursing still provided free care to residents who did not qualify for Medicare or Medicaid. Ouachita Nursing provides health-care services to residents, up front, without any guarantee of future payment for services. In some instances, Ouachita Nursing did not receive payment for its services, and continued to provide services knowing that it would not be able to collect payment. In other words, Ouachita Nursing was willing to accept residents, and in fact did accept residents, who were unable to pay for services.

4

Harrington listed twenty-four examples of free health care provided to Camden PES's residents. He stated that to the best of his belief, during his time working with Camden PES, the facility had not filed a lawsuit against a resident to collect a debt; had never turned a resident over to a collection agency; and had treated all residents uniformly regardless of ability to pay.

Finally, Camden PES submitted an affidavit from Angela Marlar, administrator of Ouachita Nursing and Rehabilitation Center and one of its board members. She stated that she receives a salary in her position as administrator but that Camden PES board members are not compensated for their service on the board. She stated that, to her knowledge, the facility never filed a lawsuit against a resident to collect a debt, never turned over residents who were unable to pay, and treated all residents uniformly regardless of their ability to pay.

Thompson filed a response on February 15, 2023, arguing that Camden PES should be denied entitlement to charitable immunity as a matter of law because it failed to comply with the *Masterson* factors. Thompson argued that the defendants structured operations in such a way to "mask[ ] actual profit of the Camden facility in a web of payments to related entities performing the traditional services of the facility. Defendants Ross Ponthie, John Ponthie, and Mark Thompson sit atop the web and ultimately collect the revenue from all of the various entities that combine to jointly operate the Camden facility." Thompson presented evidence that Camden PES—the actual entity licensed by the Arkansas Office of Long Term Care to operate a nursing home and the only alleged "nonprofit" company—has

5

no employees. Instead, the facility pays a group of related entities to supply services and personnel to the facility. Thompson also attached an affidavit from its expert, John C. Langham, CPA, who stated that he reviewed numerous documents related to the operation of Camden PES and that entity's application for status as a 501(c)(3) charitable entity for IRS purposes. He concluded that

> it is apparent that Camden - PES, Inc. was created as a shell entity to pass profits off to other related entities in order to maintain charitable status. It is my opinion that Camden - PES, Inc. does not act as a charitable entity, but rather operates Ouachita Nursing and Rehabilitation Center in the same manner as other similar for-profit nursing homes.

Langham then provided the following four specific examples on which he based his conclusion that Camden PES does not operate as a truly charitable entity:

> 5. Four of the five entities listed as Independent Contractors on Camden – PES Inc.'s IRS Form 1023, Part V, Line 1c, appear to be related to Camden - PES, Inc. through business relationships . . . . These four of the five alleged "independent contractors" were recipients of approximately $3,411,138 from Camden-PES, Inc. as shown on the Form 1023. They appear to have been incorporated by and have the same registered agent as Camden - PES, Inc., Progressive Eldercare Services, Inc. (PES, Inc.), Ponthie Holdings, LLC, P&T Holdings, LLC as well as ten other entities named Progressive Eldercare Services, ..., Inc. for 25 other Arkansas locations, 19 of which list John Ponthie or Amy Wilbourn as the Incorporator/Organizer. Attorney Amy Wilbourn, formerly of Kutak Rock's Fayetteville office, which is the same firm that submitted IRS Form 1023 for another PES facility I have reviewed, is listed as the registered agent for all of these entities. On IRS Form 1023, Part V, Line 2a - the question asks "are any of your officers, directors or trustees related to each other through family or business relationships?" The question is answered "no." However, Camden - PES, Inc.'s Articles of Incorporation provide in item #2 that the corporation has only one member and item #9 gives that one member the authority to exercise the duties of the Board of Directors and relieves the Board of Directors of their duties. According to item #1.2 of the Bylaws, PES, Inc. is the sole member and cannot be removed per item #1.4 of the Bylaws. Likewise, on IRS Form 1023, Part V, Line 2c - the question asks "are any of your officers, directors or trustees related to your highest compensated employees or highest compensated independent

6

contractors listed on lines 1b or 1c through family or business relationships?" The question is answered "no." However, in Attachment 14 (Schedule G) of the same document, Camden - PES, Inc. lists four of the five Independent Contractors listed on Line 1c as being related entities. Therefore, it appears that PES, Inc., CarePlus Staffing Services, LLC, Procare Therapy Services, LLC, Southern Administrative Services, LLC and Professional Nursing Solutions, LLC are all related business entities to Camden - PES, Inc.

6. Camden - PES, Inc. also appears to be a for profit entity based on the fact that the company appears to utilize a related "Captive Insurer" for its professional liability insurance. Based on Camden - PES, Inc.'s Arkansas cost report for the period ended June 30, 2017, Camden - PES, Inc. paid $365,934 for professional liability insurance despite the fact that they only had insurance coverage in the amount of $250,000 per occurrence and $750,000 aggregate. The cost of the insurance coverage seems extremely high for the amount of coverage provided which is consistent with the utilization of a "Captive Insurer." Based on my experience, utilization of a related "Captive Insurer" generally involves the operating company, Camden - PES, Inc., paying and deducting excessively high insurance premiums to the related "Captive Insurance" company. The premiums paid are high compared to the amount of coverage provided. The related "Captive Insurance" company enjoys the tax benefit of being able to exclude it's first $1 million dollars in premium income from ordinary income tax. Camden - PES, Inc. is only one of at least 26 Arkansas facilities believed to utilize the same "Captive Insurer" which were organized by John Ponthie and Amy Wilbourn similarly to Camden - PES, Inc. The owners of the "Captive Insurance" company then recover those excess premiums at a later date as capital gain income upon the liquidation of the "Captive Insurance" company. Said income is then taxed only as capital gains instead of ordinary income representing a significant tax savings. Utilization of a "Captive Insurer" is consistent with a for-profit entity.

7. Another example that appears to be Camden - PES, Inc. funneling profit to related entities can be seen by reviewing the Arkansas DHS Cost Report for the period from 7/1/16-6/30/17 and the IRS Form 990 Income Tax Return for 2016. The cost report indicates $6,864,379 in total revenue and $6,924,885 in total expenses. In the expense section, Column 3 "Related Party Expense Adjustment," an entity is supposed to reduce any profit from dealing with related parties in arriving at "Allowable Expenses." No entries have been made despite the fact that on IRS Form 1023, Attachment 14 (Schedule G), Camden - PES, Inc. lists four "Independent Contractors" on item 1c as being related entities. These "related entities" include CarePlus Staffing Services, LLC, Procare Therapy Services, LLC, Southern Administrative Services, LLC and Professional Nursing Solutions, LLC. Compound that with the possibility of dealing with a related "Captive Insurance" company and

7

you have the possibility for a significant overstatement of "Allowable Expenses" for purposes of the State of Arkansas DHS Cost Report. The total amount paid to the "Independent Contractors" per the 2016 IRS Form 990 Income Tax Return is $4,239,574. Adding that to the $365,934 paid for "Professional Liability Insurance" per the Arkansas DHS Cost Report, totals $4,605,508 in possible expenses paid to related entities, 67% of the total expenses of $6,924,885. At best this is disingenuous and at its worst this could be tantamount to Medicaid fraud. Again, I cannot be certain without being provided complete books and records for Camden - PES, Inc. as well as the related entities involved. Nevertheless, the related party adjustment issue referenced in this paragraph supports my opinion that Camden - PES, Inc. funnels its profits to related entities.

8. In my review of the limited records provided relating to Camden - PES, Inc., I did not find evidence of any charitable donations contributing to the operation of Ouachita Nursing and Rehabilitation. Also, given the millions of dollars in revenue generated by Camden - PES, Inc., I found no evidence of significant services being offered free of charge or to those unable to pay.

In addition to Langham's affidavit, Thompson attached deposition testimony and internal emails focused on "census goals" and resident referrals. Thompson also attached deposition testimony from the former director of nursing, Roxsanne Moseley, who claimed that she was fired because she did not reduce staffing levels "closer to the state minimum." Finally, Thompson attached Camden PES's admissions agreement that requires residents to timely pay for services provided and either assign their income directly to the facility or that a representative sign a "Personal Guarantee" for fees and charges of the resident.

At an August 2023 hearing, Camden PES argued entitlement to charitable immunity under the *Masterson* factors. It further argued that "abuse of the charitable form is not legitimately part of the analysis" but that, in any case, it did not abuse the charitable form. Following arguments, the circuit court ruled as follows:

I have looked at the exhibits that were submitted with the motion for summary judgment. I have also looked through the two expert [witnesses'] testimony. And they are differing views essentially of the same facts, but I agree that plaintiff's expert has provided the more accurate description of what has happened here. A[s] such I don't believe that charitable immunity is appropriate to this defendant, and thus I am denying the motion for summary judgment on the charitable immunity question.

On April 14, 2023, the circuit court entered an order denying Camden PES's summary-judgment motion.[2] On March 12, 2023, Camden PES timely filed its notice of appeal.

II. *Points on Appeal*

Camden PES argues three points on appeal: (1) that it is entitled to summary judgment in light of the factors adopted by the supreme court; (2) that "abuse of the charitable form" is not a valid factor for consideration in analyzing charitable immunity; and (3) that even if abuse of the charitable form is part of the analysis, it did not did not abuse the charitable form.

---

[2]Before the summary-judgment hearing, the circuit court stayed proceedings because Camden PES's motion raised charitable-immunity issues overlapping with another case before the same circuit court, *Whitney v. Camden - Progressive Eldercare Services, Inc.*, Case No. 52CV-17-158. In *Whitney*, the circuit court had denied Camden PES's summary-judgment motion because material-fact issues precluded a grant of summary judgment. On appeal, this court reversed and remanded, holding that the circuit court erred in finding that there were disputed issues of material fact. *Camden Progressive Eldercare Servs., Inc. v. Whitney*, 2022 Ark. App. 239, at 11, 646 S.W.3d 374, 383. Rather, this court's review of the record revealed that there were no material factual issues; rather, there were different interpretations of undisputed facts, and the circuit court should grant summary judgment "if, upon review of the evidence on remand, the court determines that reasonable persons would not reach different conclusions on the undisputed facts." *Id.* at 17, 646 S.W.3d at 385. Following remand, the circuit court held a joint hearing in *Whitney* and the present case, and it denied Camden PES's charitable-immunity motions in both cases. Although Camden PES filed an interlocutory appeal in this case, it did not file an appeal in *Whitney*.

The standard for whether to grant summary judgment in a charitable-immunity case was set forth by our supreme court in *Anglin v. Johnson Regional Medical Center*, 375 Ark. 10, 15, 289 S.W.3d 28, 31 (2008): "The law is well settled that summary judgment is to be granted by a circuit court when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law." Additionally, in *Davis Nursing Home Ass'n v. Neal*, 2019 Ark. 91, 570 S.W.3d 457, the supreme court held that, although disputed factual issues concerning an organization's charitable status may be presented to a jury, the ultimate question of charitable immunity is a matter for the court to decide. The court elaborated that,

> In some cases, while there may be fact issues involved, they are not matters of disputed facts. Rather they are differing legal interpretations of undisputed facts. In such cases, the circuit court should grant summary judgment where reasonable persons would not reach different conclusions based upon those undisputed facts.
>
> . . . .
>
> If the existence of charitable immunity turns on disputed factual issues, then the jury may determine the facts, and the circuit court will subsequently determine whether those facts are sufficient to establish charitable immunity.

*Id.* at 6–8, 570 S,W.3d at 461–62 (citations omitted).

Additionally, this court's opinion in *Whitney*, 2022 Ark. App. 239, 646 S.W.3d 374, is instructive in this case since the two appeals involve the same appellant (Camden PES) appealing the issue of charitable immunity with the parties relying on the same affidavits from the same competing experts in both cases. Just as this court held after reviewing the record in *Whitney*, we see no genuine issues of material fact precluding summary judgment

in this case. Rather, this appears to be a case where there are different interpretations of undisputed facts. We agree Camden PES is not entitled to charitable immunity as a matter of law. Therefore, we affirm the denial of summary judgment on the issue of Camden PES's entitlement to charitable immunity.

The essence of the charitable-immunity doctrine is that organizations such as agencies and trusts created and maintained exclusively for charity may not have their assets diminished by execution in favor of one injured by acts of persons charged with duties under the agency or trust. *St. Bernard's Cmty. Hosp. Corp. v. Cheney*, 2021 Ark. App. 236, at 5, 625 S.W.3d 398, 403. Charitable immunity is immunity from suit, not simply immunity from liability. *Id.* Immunity from suit is an entitlement not to stand trial or face the other burdens of litigation, while immunity from liability is a mere defense to a suit. *Id.* Because the charitable-immunity doctrine favors charities and results in a limitation of potentially responsible persons whom an injured party may sue, we give the term "charitable immunity" a narrow construction. *Id.*

In *Masterson*, 321 Ark. 391, 902 S.W.2d 803, the supreme court delineated several factors to determine whether an organization is entitled to charitable immunity. These factors are:

> (1) whether the organization's charter limits it to charitable or eleemosynary purposes; (2) whether the organization's charter contains a "not-for-profit" limitation; (3) whether the organization's goal is to break even; (4) whether the organization earned a profit; (5) whether any profit or surplus must be used for charitable or eleemosynary purposes; (6) whether the organization depends on contributions and donations for its existence; (7) whether the organization provides its services free of charge to those unable to pay; and (8) whether the directors and officers receive compensation.

11

*Id.* at 401, 902 S.W.2d at 809. These factors are illustrative, not exhaustive, and no single factor is dispositive of charitable status. *Id.* at 401, 902 S.W.2d at 810. This court has also held that a pivotal issue in determining one's entitlement to charitable immunity is whether the charitable form has been abused. *See Watkins v. Elder Outreach of Little Rock*, 2012 Ark. App. 301, 420 S.W.3d at 477. After *Watkins* and its progeny, this court has consistently engaged in an analysis of whether there has been abuse of the charitable form when deciding charitable-immunity cases. *See, e.g., Progressive Eldercare Servs.-Saline, Inc. v. Cauffiel*, 2016 Ark. App. 523, 508 S.W.3d 59; *Camden Progressive Eldercare Servs., Inc. v. Whitney*, 2022 Ark. App. 239, 646 S.W.3d 374.

For reversal, Camden PES argues that under the *Masterson* factors, it is entitled to the defense of charitable immunity and that abuse of the charitable form is not part of the charitable-immunity analysis recognized by our supreme court. We disagree. In fact, in *Whitney*, we rejected Camden PES's current argument, noting that when the supreme court delivered *Masterson* in 1995, it held that the eight factors listed are illustrative and not exhaustive. 2022 Ark. App. 239, at 15, 646 S.W.3d at 384–85. We further explained that for more than ten years, we have consistently engaged in an analysis of whether there has been abuse of the charitable form when deciding charitable-immunity cases, and we have done so without rebuke from the supreme court. *Id.* We see no reason to depart from this well-settled charitable-immunity precedent now.

Here, the circuit court's order stated it was denying summary judgment because Camden PES was not entitled to charitable immunity. Generally, a written order controls

12

over oral pronouncements, but that is the case only when there is a conflict or a discrepancy between the oral ruling and the written order. *See Stills v. Stills*, 2010 Ark. 132, 361 S.W.3d 823. Here, however, there is no conflict or discrepancy between the circuit court's oral rulings and its written order. The oral ruling explains the simple denial in the written order, and we routinely rely on a circuit court's oral statements from the bench to inform or to explain the reasoning behind a written order. *See, e.g., Grindstaff v. Strickland*, 2017 Ark. App. 634, 535 S.W.3d 661. Here, the circuit court's statements from the bench demonstrate that its overriding reasoning for denying Camden PES's motion for summary judgment was due to Camden PES's abuse of the charitable form. In making that determination, the circuit court stated,

> And I agree, the issue before the Court really does turn to this question of whether Camden PCS has been created essentially as a shell corporation. And that really does come down to the heart of the argument. And I have looked over the factors that the Supreme court has given us, and I acknowledge Ms. Blassingame's argument that this shell corporation issue is an Appellate Court creation, but they too preside over me, so I have to at this point accept that there is an issue.

> . . . I agree that plaintiff's expert has provided the more accurate description of what has happened here. And such I don't believe that charitable immunity is appropriate to this defendant.

While it is clear the circuit court considered the *Masterson* factors and abuse of the charitable form in making its determination, it did not provide an express rationale as to how each *Masterson* factor applied. However, assuming arguendo that the court had gone through each *Masterson* factor and found that the factors pointed toward charitable

13

immunity, the court's ruling is still supported by its finding that abuse of the charitable form occurred.

Finally, Camden PES argues that even if it abused the charitable form—which it claims that it did not—Thomspon failed to prove that Camden PES's abuse of the charitable form caused injury to Ms. Thompson or the estate. It argues that charitable-form abuse stems from the equitable doctrine of piercing the corporate veil when a defendant abuses the corporate form. *Watkins*, 2012 Ark. App. 301, at 11, 420 S.W.3d at 484 (citing *K.C. Props. of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC*, 373 Ark. 14, 280 S.W.3d 1 (2008)). The party seeking to pierce the corporate veil has the burden of proving the corporate form "was abused to his injury." *K.C. Props.*, 373 Ark. at 33, 280 S.W.3d at 16. However, no showing of injury is required because charitable immunity is not interchangeable with the concept of piercing the corporate veil, and under Arkansas law, immunity is an affirmative defense, and the party asserting it bears the burden of proving it. *Downing v. Lawrence Hall Nursing Ctr.*, 2010 Ark. 175, at 11, 369 S.W.3d 8, 15. Therefore, because the burden remains with Camden PES to prove its entitlement to charitable immunity and not with Thompson to prove "injury," we see no reason to stray from the law at this time.

We see no error in the circuit court's denial of summary judgment as to abuse of the charitable form. Therefore, because the circuit court did not err in finding that, as a matter of law, Camden PES was not entitled to the defense of charitable immunity, we affirm the denial of summary judgment.

Affirmed.

KLAPPENBACH, C.J., and HIXSON, J., agree.

*Kutak Rock LLP*, by: *Mark Dossett*, *Jeff Fletcher*, *Zach Musgraves*, and *Caleb S. Sugg*, for appellants.

*Reddick Law, PLLC*, by: *Matthew D. Swindle* and *Heather G. Zachary*, for appellee.